## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

BANK POLICY INSTITUTE
  1300 Eye Street, N.W., Suite 1100 West
  Washington, D.C. 20005;

OHIO CHAMBER OF COMMERCE
  34 South Third Street, Suite 100
  Columbus, OH 43215;

OHIO BANKERS LEAGUE
  4215 Worth Avenue, Suite 300
  Columbus, OH 43219;

AMERICAN BANKERS ASSOCIATION
  1333 New Hampshire Avenue, N.W.
  Washington, D.C. 20036;

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA
  1615 H Street, N.W.
  Washington, D.C. 20062,

          Plaintiffs,

   v.

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM
  20th Street and Constitution Avenue, N.W.
  Washington, D.C. 20551,

          Defendant.

Civil Action No. _____

**Complaint**

Plaintiffs Bank Policy Institute, Ohio Chamber of Commerce, Ohio Bankers League, American Bankers Association, and Chamber of Commerce of the United States of America allege as follows:

1.    This case concerns the annual "stress tests" used by the Board of Governors of the Federal Reserve System ("the Board") to establish certain bank capital requirements. Plaintiffs do not oppose stress testing or capital requirements, both of which can be instrumental to the safety and soundness of the U.S. financial system. They can also, however, have a great impact on the cost of financial services for all Americans. Federal regulations in an area this consequential should be adopted in a manner that complies with the requirements Congress laid down to ensure fair, rigorous rulemakings and rational results.

2.    The current stress-testing process falls short of these requirements. Adopted in secret, it produces vacillating and unexplained requirements and restrictions on bank capital. The goal of this suit is to ensure that, going forward, bank capital requirements are established in a transparent manner, with public input, in accordance with the Administrative Procedure Act ("APA"), the Due Process Clause, and the standards our democracy employs to better the law through participation of the public.

3.    To be clear, Plaintiffs do not oppose stress-capital buffer requirements or conducting tests to determine those requirements—on the contrary, Plaintiffs support such a buffer and the appropriate use of stress-test results to determine it. Nor do Plaintiffs seek to upend banks' capital requirements or to disrupt the Board's application of the stress tests. Instead, Plaintiffs bring this lawsuit to help ensure that beginning in 2026, the Board subjects the components of the stress tests to public notice and comment and complies with other applicable legal requirements.

4. Plaintiffs have long sought to work with the Board to improve the stress-test process and address its legal deficiencies, and recently, the Board announced its intention to make changes to the existing process. Those announced changes, if finalized, would potentially address some if not all of Plaintiffs' concerns with the current framework and practices. Plaintiffs applaud the Board's announcement. However, the deadline for a court challenge to some of the government actions undergirding the current stress test process is February 2025, and Plaintiffs cannot be certain at this time that the Board's recently-announced reforms will provide a timely remedy to the harms arising under the current system. Plaintiffs therefore file this suit to preserve their legal rights and to ensure timely reform to the current, flawed process. Plaintiffs intend to work collaboratively with the Board in its announced rulemakings.

## I.    Introduction

5. In a day when many of our government's most important legal proscriptions are issued by federal regulatory agencies, the public's democratic right to participate in the making of the law is secured in important part by the Administrative Procedure Act. The APA requires that the public be notified of the terms of new proposed rules; that the public be given the opportunity to comment and suggest improvements to those rules, and receive meaningful responses from the agency to those comments and suggestions; and that the rules, once finalized, be published so the public may know the standards by which they will be judged and can conform their conduct accordingly.

6. These procedures "give[] affected parties fair warning of potential changes in the law and an opportunity to be heard on those changes." *Azar v. Allina Health Servs.*, 587 U.S. 566, 582 (2019). They better the law—make it more sensible and fair—by giving the government the benefit of the public's views and practical experience. They also ensure that "all persons" will "'be informed as to what the State commands or forbids'"—as required by the "rule of law" and

by elementary due process. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972). And they guarantee that no agency may "develop a body of 'secret law,'" used "in the discharge of its regulatory duties and in its dealings with the public," yet "hidden behind a veil of privilege." *Elec. Frontier Found. v. U.S. Dep't of Just.*, 739 F.3d 1, 7 (D.C. Cir. 2014) (quotation marks omitted).

7.     This case concerns a series of actions by the Board of Governors of the Federal Reserve System that transgress those principles—and that impose annual costs of billions of dollars on individual American companies and, ultimately, many billions more upon the economy as a whole. The Board uses its annual "stress test" process to establish a "stress-capital buffer" for individual banks. Each year, the Board chooses a hypothetical set of economic conditions and other components known as "scenarios," and then uses internal models to project how banks would fare under those scenarios. Yet in large part, the Board keeps the standards it applies in these tests secret—it does not publicly disclose the specifics of its internal "models," which form the backbone of the tests, and it makes changes to the stress tests each year without giving the public any chance to comment.

8.     The stress tests result in directives to banks that can vacillate widely from one year to the next, sometimes imposing billions of dollars in unexpected capital burdens on individual banks with no evident reason, and with adverse effects on the economy as a whole. The capital requirements established by the stress tests restrict banks' use of their assets and their ability to make certain capital distributions and discretionary bonus payments.

9.     The financial consequences of the annual stress tests are enormous, affecting a bank's ability to extend credit and act as an intermediary in capital markets. Despite these consequences and the legally binding nature of the tests, their key components—the scenarios and the Board's models—are never subjected to notice and comment. In the case of the models, the Board

never even makes them public, withholding critical information about how they were developed and operate, despite repeated requests from banks and others to be apprised of the standards by which they are being judged. The Board does disclose the annual scenarios, but it develops them—including potentially outcome-determinative assumptions—without notice-and-comment rule-making or any other opportunity for regulated parties and others to provide input.

10. The Board's lack of transparency results in significant and unpredictable volatility in banks' capital requirements. This, in turn, impairs the ability of banks to efficiently deploy capital, including making loans to small businesses and others who are crucial engines of growth and job creation in the U.S. economy. When banks are forced to hold excess capital—not to protect against the risk of loss, but instead to guard against the volatility of the Board's undisclosed and ever-changing criteria—it reduces credit availability, hinders economic growth, and harms the American consumer.

11. Meanwhile, recent experience has shown the value of public notice and comment on the Board's capital requirements. Last year, the Board and other bank regulators did "show their work" by publishing for notice and comment a separate set of rules regarding banks' capital requirements—those rules and their underlying assumptions and criteria came under heavy criticism. The criticism came from a broad and diverse set of commenters, including small businesses, civil-rights advocates, and academics. In response, the Board's Chair and Vice Chair for Supervision vowed that the rules' parameters would be substantially altered in the final rule.

12. The models and scenarios used in the 2024 stress tests and in the upcoming stress-tests in 2025 and 2026, and the Board's stress-test regime more broadly, are unlawful for at least three reasons.

13.    *First*, under the APA, agencies cannot adopt legislative rules without engaging in notice-and-comment rulemaking.  5 U.S.C. § 553.  The scenarios and the models are integral components of legislative rules, and legislative rules themselves, because the Board uses them to determine banks' capital requirements, and as a result, they "have the force and effect of law."  *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1143 (6th Cir. 2022) (quotation marks omitted).  The Board is therefore required to use notice-and-comment rulemaking to promulgate the annual scenarios, the models that determine banks' performance in those scenarios, and in making future changes to both the scenarios and the models.  The Board's failure to do so deprives regulated parties of transparency, fairness, and the benefits of the government's own "mature consideration of rules of general application."  *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 597 (6th Cir. 2024) (quotation marks omitted).

14.    *Second*, the government cannot establish a party's legal obligations in secret.  Doing so violates the APA, which mandates the publication of "substantive rules of general applicability," "statements of general policy or interpretations of general applicability," and "each amendment, revision, or repeal of the foregoing."  5 U.S.C. § 552(a)(1)(D), (E).  The Board's hidden standards and criteria for setting capital requirements also contravene basic principles of due process, which require the Board to give fair notice before restricting banks' control over their own assets.  *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

15.    *Third*, the Board actions that established the current program—under which stress tests are used to determine capital requirements—are actions which themselves were arbitrary and capricious and contrary to law under the APA.  In addition to the scenarios and models that were used to determine the banks' stress-capital buffers in 2024 and that will be used in 2025 and 2026, this lawsuit challenges four interrelated actions by the Board in 2019 and 2020, discussed in detail

below: (1) the Policy Statement on the Scenario Design Framework for Stress Testing ("Scenario Policy Statement"), (2) the Stress Testing Policy Statement, (3) the Enhanced Model Disclosure Document (collectively, the "2019 Policy Statements"), and (4) the Rule on Regulatory Capital, Capital Plan, and Stress Test Rules ("2020 Rule").

16.     In the Scenario Policy Statement, the Board delineated at a high level how it planned to develop the annual scenarios. It acknowledged that commenters (including The Clearing House Association, one of the Bank Policy Institute's predecessors, and the Chamber of Commerce of the United States of America) suggested and supported publishing the scenarios for notice and comment. 84 Fed. Reg. 6,651, 6,654/3 (Feb. 28, 2019). But the Board failed to meaningfully consider that option—as required by the APA—or to give a "reasoned response" to commenters' concerns, thus rendering the final rule arbitrary and capricious. *Ohio v. EPA*, 144 S. Ct. 2040, 2054 (2024).

17.     In the second and third challenged actions, the Stress Testing Policy Statement and the Enhanced Model Disclosure Document, the Board addressed the stress-test models. Once more, commenters requested greater transparency, and once more, the agency failed to meaning-fully consider their comments. In declining to make the models available to the public, the Board hypothesized that publication would lead banks to "conceivably use [the models] to make modifi-cations to their businesses that change the results of the stress test without actually changing the risks they face." 84 Fed. Reg. 6,784, 6,785/2 (Feb. 28, 2019). This is an arbitrary and unlawful justification for keeping the models secret. Any effort by a bank to artificially "game" the models could be addressed by the Board through its monitoring and supervisory powers. More to the point, conformance with legal standards is a desirable outcome, not a "material risk[]." *Id.* And to the extent banks could make modifications that would improve performance in the stress tests

6

without improving their risk profile, that would reflect weaknesses in the models themselves—weaknesses that could be fixed by publishing the models for comment and receiving input from more subject-matter experts. The Board's reasoning thus "failed to supply a satisfactory explanation for its action" and "ignored an important aspect of the problem before it." *Ohio*, 144 S. Ct. at 2054 (quotation marks omitted).

18.     In the fourth challenged action, the 2020 Rule, the Board formally incorporated the results of the stress tests into banks' capital requirements through the stress-capital buffer. Banks again requested disclosure and notice-and-comment rulemaking for the models and scenarios, emphasizing the volatility and unpredictability caused by the Board's purportedly unlimited discretion over the contents of the stress tests. The Board again failed to adequately respond to these comments. On the issue of the models, the Board said simply that "the Board's methodology for conducting the supervisory stress test was not part of the proposal." 85 Fed. Reg. 15,576, 15,589/3 (Mar. 18, 2020). This does not come close to the reasoned explanation that an agency must give to overcome arbitrary-and-capricious review—"awareness is not itself an explanation." *Ohio*, 144 S. Ct. at 2054.

19.     For all these reasons, Plaintiffs bring this action to vacate and set aside the 2019 and 2020 Board actions establishing the current stress-test regime; to declare unlawful the models and the scenarios that were used in the 2024 stress tests and that will be used in the 2025 and 2026 stress tests; and to require the Board to subject the stress-testing framework, including both its stress-test scenarios and models, to notice and comment before the Board begins the 2026 stress tests.

## II.    Parties

20.     Plaintiff Bank Policy Institute ("BPI") is a nonpartisan public policy, research, and advocacy group. BPI's members include universal banks, regional banks, and major foreign banks

doing business in the United States. Many of BPI's members—including Bank of America Corporation; Citigroup, Inc.; Citizens Financial Group, Inc.; Fifth Third Bancorp; Goldman, Sachs & Co.; Huntington Bancshares Inc.; JPMorgan Chase & Co.; Morgan Stanley; The PNC Financial Services Group, Inc.; U.S. Bancorp; and Wells Fargo & Co.—are required to participate in the supervisory stress tests and comply with the capital requirements that are challenged in this case.

21. Plaintiff Ohio Chamber of Commerce is a voluntary business association supporting free enterprise, competition, and economic growth in the State of Ohio. This has included opposing bank capital rules that make it more difficult for banks to extend credit to small businesses, thereby harming the local economy in Ohio.[1] Numerous Ohio Chamber of Commerce members or their parent entities are subject to the stress tests and the stress-capital buffer, including Fifth Third Bancorp; Huntington Bancshares Inc.; JPMorgan Chase & Co.; The PNC Financial Services Group, Inc.; and U.S. Bancorp. All of these members or their affiliates are headquartered in Ohio and all have substantial operations in Ohio.

22. Plaintiff Ohio Bankers League is a voluntary trade association supporting the banking industry—including commercial banks, savings banks, and savings and loan associations—in the State of Ohio. The Ohio Bankers League has numerous members that are the principal bank subsidiaries of bank holding companies that are subject to the stress tests and the stress-capital buffer—including Bank of America, N.A.; Citibank, N.A.; Fifth Third Bank, N.A.; Huntington National Bank; JPMorgan Chase Bank, N.A.; The PNC Bank, N.A.; U.S. Bank, N.A.; and Wells Fargo Bank, N.A. Five of these members or their affiliates are headquartered in Ohio and six have substantial operations in Ohio.

---

[1] *See* Steve Stivers, Ohio Chamber of Commerce, *New Banking Rules Would Hurt Ohio Farmers and Manufacturers* (May 13, 2024).

23.     Plaintiff American Bankers Association ("ABA") represents the banking industry in the United States.  The ABA supports its members with education, tools, and dedicated advocacy before Congress, regulatory agencies, and courts.  Many ABA members are required to participate in the supervisory stress tests and comply with the capital requirements that are challenged in this case, including Bank of America Corporation; Citigroup, Inc.; Citizens Financial Group, Inc.; Fifth Third Bancorp; Goldman, Sachs & Co.; Huntington Bancshares Inc.; JPMorgan Chase & Co.; Morgan Stanley, The PNC Financial Services Group, Inc.; U.S. Bancorp; and Wells Fargo & Co.

24.     Plaintiff Chamber of Commerce of the United States of America ("U.S. Chamber") is the world's largest business federation, representing the interests of companies and professional organizations of every size, in every industry sector, and across geographic regions.  Many U.S. Chamber members are required to participate in the supervisory stress tests and comply with the capital requirements that are challenged in this case, including Bank of America Corporation, Citigroup, Inc., JPMorgan Chase & Co., Morgan Stanley, The PNC Financial Services Group, Inc., U.S. Bancorp, and Wells Fargo & Co.

25.     Defendant the Board of Governors of the Federal Reserve System is the governing body of the Federal Reserve.  The Board is a government agency headquartered at 2051 Constitution Avenue, N.W., Washington, D.C. 20418.

## III.    Jurisdiction And Venue

26.     This action arises under the APA, 5 U.S.C. §§ 500 *et seq.*, and the U.S. Constitution.  This Court therefore has subject-matter jurisdiction under 28 U.S.C. § 1331.

27.     Plaintiffs have associational standing to challenge the various Board actions at issue in this case on behalf of their members.  Plaintiffs' members are directly and adversely affected

by the various Board actions at issue in this case and thus have standing to sue in their own right. Specifically, the Board's actions impose binding capital requirements on Plaintiffs' members, thus injuring those members in a concrete and particularized manner. For example, in 2024, the Board used the stress tests to set stress-capital buffers for banks, and if banks' capital falls below those regulatory minimums, they face automatic restrictions on capital distributions and discretionary bonus payments. 12 C.F.R. § 217.11(c). In 2025 and 2026, the Board will follow the same process to set the next year's stress-capital buffers for banks.

28.   In addition, the challenged actions conflict with each Plaintiff's policy objectives, and challenging the actions is germane to the organizational purpose of each Plaintiff. All Plaintiffs support and advocate for banks that are subject to the stress tests, and the Ohio Chamber of Commerce and U.S. Chamber also represent the interests of businesses affected by banks' restricted ability to lend under the Board's stress-test regime. The Ohio Chamber of Commerce has members located in Ohio that are subject to the stress tests and that are affected by the stress tests, and the Ohio Bankers League has members located in Ohio that are likewise affected by the stress tests because they are the principal bank subsidiaries of bank holding companies that are subject to the stress tests.

29.   The Plaintiffs' members' individual participation is not necessary because this lawsuit seeks only declaratory and injunctive relief, *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996), and "raises a pure question of law" that does not require the court to "consider the individual circumstances of any aggrieved . . . member," *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 287 (1986).

30.     Venue is proper under 28 U.S.C. § 1391(e)(1) because this is an action against an agency of the United States; both the Ohio Chamber of Commerce and the Ohio Bankers League maintain their principal place of business in Columbus, Ohio; and no real property is involved.

## IV.     Background

### A.     Legal Requirements For Promulgating Agency Rules

31.     The Administrative Procedure Act governs the process that federal agencies must follow when issuing legislative rules.  The APA defines "rule" broadly to include "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4).  The hallmark of a legislative rule is that it "impose[s] new rights or duties and change[s] the legal status of regulated parties." *Mann Constr.*, 27 F.4th at 1143. "When rulemaking carries out an express delegation of authority from Congress to an agency, it usually leads to legislative rules." *Id.*

32.     Under the APA, when an agency is contemplating a new legislative rule, it must first publish a proposed rule and invite the public to comment.  5 U.S.C. § 553(b).  Specifically, the agency must publish a "[g]eneral notice of proposed rule making" in the Federal Register, together with a "reference to the legal authority under which the rule is proposed," and "either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.* § 553(b)(2), (3).  Then, the agency "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* § 553(c).  The agency must consider submitted comments carefully, and must respond to significant comments and objections when issuing the final rule.  Once the rule is finalized, the agency must issue with its text "a concise general statement of [its] basis and purpose." *Id.*

33.      "[T]he APA's notice-and-comment rulemaking requirements were intended to as-sure fairness and mature consideration of rules of general application."  *Tennessee*, 104 F.4th at 597 (quotation marks omitted).  In addition to allowing the public "'to participate in the promul-gation of . . . rules,'" *id.*, the notice-and-comment process "affords the agency a chance to avoid errors and make a more informed decision," *Mann Constr.*, 27 F. 4th 1142 (quoting *Allina Health Servs.*, 587 U.S. at 582).  Given these important goals, notice-and-comment requirements are rig-orously enforced.  Although the APA exempts certain limited categories of agency action from notice and comment, courts construe any exemptions narrowly.  *See, e.g.*, *United States v. Cain*, 583 F.3d 408, 420 (6th Cir. 2009) ("[T]he good cause exception is narrowly construed and only reluctantly countenanced." (quotation marks omitted)); *Mendoza v. Perez*, 754 F.3d 1002, 1023 (D.C. Cir. 2014) ("The exception for procedural rules is narrowly construed.").

34.      Consistent with basic principles of fairness and due process, the APA also imposes a publication requirement.  Section 552(a) provides that agencies "shall . . . publish in the Federal Register" certain agency actions, including "substantive rules of general applicability," "state-ments of general policy or interpretations of general applicability," and "each amendment, revi-sion, or repeal of the foregoing."  5 U.S.C. § 552(a)(1)(D), (E); *see also id.* § 553(d) (requiring that, subject to limited exceptions, a rule "shall be" published "not less than 30 days before its effective date").  If regulated parties lack "actual and timely notice" of "a matter required to be published in the Federal Register [which is] not so published," they "may not in any manner be required to resort to, or be adversely affected by" the agency action in question.  *Id.* § 552(a).

35.      The APA's publication requirement supplements the Federal Register Act, which likewise requires the publication of certain government actions.  44 U.S.C. § 1505.  As Congress

recognized in enacting both the APA and the Federal Register Act, transparent government action is paramount in any functioning democracy. *See Elec. Frontier Found.*, 739 F.3d at 7.

**B.      The Board's Process For Determining Banks' Capital Requirements Through Annual Stress Tests**

36.      In the Dodd-Frank Wall Street Reform and Consumer Protection Act, Congress directed the Board to "conduct annual analyses in which nonbank financial companies supervised by the Board of Governors and bank holding companies . . . are subject to evaluation of whether such companies have the capital, on a total consolidated basis, necessary to absorb losses as a result of adverse economic conditions" and continue lending to households and businesses under stressful conditions. 12 U.S.C. § 5365(i)(1)(A). These annual analyses are referred to as "supervisory stress tests." *Id.* § 5365 note.

37.      Under the Board's current regulations, three types of banks must undergo the supervisory stress tests: (1) "[a]ny U.S. bank holding company with average total consolidated assets of $100 billion or more," (2) "[a] U.S. intermediate holding company with total consolidated assets of $100 billion or more," and (3) "[a]ny nonbank financial company supervised by the Board that is made subject to" the stress-test requirements "pursuant to a rule or order of the Board." 12 C.F.R. §§ 252.43(a), 252.153(e)(5). Supervisory testing occurs either annually or biennially, depending on the bank's size. *Id.* § 252.44(d)(1). Larger banks are also required to conduct their own internal stress tests every year and report the results to the Board. *Id.* §§ 252.53, 252.54.

38.    The Board has published the following graphic showing how its annual stress tests work, including how they affect banks' capital requirements:



Board of Governors of the Federal Reserve System, *2024 Stress Test Scenarios* iii (Feb. 15, 2024), https://www.federalreserve.gov/publications/files/2024-stress-test-scenarios-20240215.pdf ("*2024 Stress Test Scenarios*").

39.    At a high level, and behind closed doors, the Board develops the supervisory stress tests as follows.  First, for each supervisory stress test, the Board develops projections of potential U.S. economic conditions over the next several years, along with other components such as a hypothetical global market shock.  These "scenarios" cover a wide range of variables, such as GDP growth, the unemployment rate, inflation, interest rates, real estate prices, and more.  The Board "provide[s] for at least 2 different sets of conditions": a "baseline" scenario and a "severely adverse" scenario.  12 U.S.C. § 5365(i)(B)(i); 12 C.F.R. § 252.44(b).  The baseline scenario "follows

a profile similar to that of average projections from a survey of economic forecasters," whereas the severely adverse scenario represents a hypothetical "adverse economic environment." *2024 Stress Test Scenarios* 3. The Board has consistently disclaimed that the severely adverse scenario incorporates actual predictions, and instead characterizes it as "a hypothetical scenario designed to assess the strength and resilience of banks." *Id.* at 5.

40. The Board has disclosed only a limited amount of information about its general approach to developing the scenarios. And the specifics of any given scenario are adopted without any input from the public.

41. The scenarios vary substantially from year to year, contributing to significant year-to-year variability in banks' stress-capital charge. Specifically, in 2019 the severely adverse scenario modeled "a severe global recession," characterized by a decline in the 10-year Treasury yields of approximately 2.2 percent. Board of Governors of the Federal Reserve System, *2019 Supervisory Scenarios for Annual Stress Tests Required under the Dodd-Frank Act Stress Testing Rules and the Capital Plan Rule* 4 (Feb. 13, 2019). By contrast, the severely adverse scenario for 2018 kept the 10-year Treasury yields unchanged throughout the scenario period. Board of Governors of the Federal Reserve System, *2018 Supervisory Scenarios for Annual Stress Tests Required under the Dodd-Frank Act Stress Testing Rules and the Capital Plan Rule* (Feb. 1, 2018). These varying projections of long-term interest rates result in vastly different projections of banks' unrealized gains and losses, which in turn has a large impact on banks' hypothetical decline in capital in the severely adverse scenario.

42. To apply these scenarios and run the stress tests, the Board collects comprehensive financial information from banks. This information includes a bank's "capital plan," which is an

"assessment of the expected uses and sources of capital" over the next 9 quarters, including "[e]stimates of projected revenues, losses, reserves, and pro forma capital levels." 12 C.F.R. § 225.8(e)(2)(i)(A). Banks also submit details about their balance sheets, expected income, losses, and capital, asset classes, capital components, pre-provision net revenue, and loan portfolios. Board of Governors of the Federal Reserve System, *FR Y-14 Information Collection Q&As* (July 10, 2023); Board of Governors of the Federal Reserve System, *2024 Supervisory Stress Test Methodology* (Apr. 12, 2024) (explaining that stress tests consider data reported on FR Y-9C and FR Y-14 forms).

43.     The Board uses the collected information to assess how banks would fare under its hypothetical scenarios. 12 C.F.R. § 252.44(a); *see* 12 U.S.C. § 5365(i)(1)(A), (B)(iii). To do this, the Board evaluates each bank's data using internal statistical "models" that are intended to project the bank's performance under both scenarios. *See* 12 C.F.R. § 252.44(a), (b).

44.     These models are critical to the stress tests that determine the capital banks must hold, yet they are not publicly available, and the Board has declined to provide key information about how they operate. As for the information the Board does provide, much of it comes late in the process. In 2023, the Board withheld its explanation of that year's models until the very end of the stress-testing process, well after banks' submissions to the Board, when the Board informed banks how they performed under the tests—and of the requirements they had to adhere to as a result. In 2024 and other years, this information was provided near in time to the deadline for banks' submission of data to the Board for the stress tests.

45.     As one example, the Board fails to make sufficient information available for the public to understand how it models potential "operational risk" losses, meaning losses resulting from inadequate or failed internal processes and systems, employee misconduct, or external events.

This could include a wide range of potential loss events, such as fraud, cyberattacks, natural disasters, and legal or regulatory compliance failures. The Board purports to estimate these potential losses in setting banks' stress-capital buffer through the stress tests, but has not made public any information that would enable banks or the public to know how the Board arrives at those estimates. The Board does not even tell individual banks or the public how those banks performed on the operational-risk metric and how that affected their capital buffer—only aggregate operational-risk losses are disclosed.

46. Projected operational-risk losses are an important determinant of banks' stress-capital buffer requirements, accounting for 22 percent of the total losses in the stress tests in 2024. Similarly, in 2023, operational-risk losses accounted for about 25 percent of the total losses modeled in the stress tests.

47. The models used in stress tests are a significant source of year-over-year volatility in the results. Increased transparency during a public notice-and-comment period would allow the public to identify such issues more quickly and encourage the Board to make necessary adjustments. A reduction in volatility would in turn obviate the need for banks to hold excessive capital or make other unnecessary changes in their activities to guard against unexpected, arbitrary swings in their capital requirements. The notice-and-comment process would also increase the models' ability to accurately judge risk by bringing the public's expertise to bear to identify areas of improvement for the Board.

48. For each bank, the Board uses the results of the stress tests to establish the stress-capital buffer—a specific ratio of "common equity tier 1 capital to risk-weighted assets" that the bank must maintain. 12 C.F.R. § 225.8(f)(2)(i)(A). The bank's stress-capital buffer will be higher or lower depending on the results of the tests, subject to a 2.5 percent regulatory minimum. *Id.*

§ 225.8(f)(2)(ii).  The bank must maintain sufficient capital to account for its stress-capital buffer (along with the bank's other capital requirements), or else it will face increasingly strict restrictions on its ability to make distributions and discretionary bonus payments.  *Id.* § 217.11(c).

49.    The stress-capital buffer is one of several mandatory capital requirements that, in combination, add up to a bank's total capital requirement.  As a consequence, banks are subject to substantial capital requirements even without stress testing or the stress-capital buffer.  Banks that are not subject to the stress-capital buffer are subject to a different buffer that serves a similar purpose: the capital-conservation buffer, which is 2.5 percent (an amount that is identical to the minimum stress-capital buffer).  12 C.F.R. § 3.11(a)(3), (a)(4)(ii).

50.    At the conclusion of this annual process for determining banks' stress-capital buffer, the Board reports the results of the stress tests to banks, advises each bank of the buffer it must maintain, and publicly discloses a summary of the results.  12 C.F.R. §§ 252.46, 225.8(f); *see* 12 U.S.C. § 5365(i)(B)(v).  Each bank must then determine the impact of the stress-capital buffer on its planned capital distributions.  If the bank's planned distributions would cause its capital level to fall below the buffer, it must adjust its distributions and provide the Board with its final, revised capital plan.  12 C.F.R. § 225.8(h).  After reporting the impact of the stress-capital buffer, a bank may still choose to adjust capital distributions, but the bank "may not adjust its planned capital distributions to be inconsistent with the effective capital distribution limitations assuming the stress capital buffer requirement provided by the Board."  *Id.*

51.     Since 2020, banks have been permitted to administratively appeal their stress-test results to the Board.  But these appeals are rarely successful.[2]  That is unsurprising:  How can you effectively appeal when you were not told the standards by which you were judged?

## C.     The 2019 And 2020 Rulemakings

52.     The current regime for establishing capital buffers discussed above is the result of four interrelated agency actions that occurred in 2019 and 2020: (1) the Policy Statement on the Scenario Design Framework for Stress Testing ("Scenario Policy Statement"), (2) the Stress Testing Policy Statement, (3) the Enhanced Model Disclosure Document, and (4) the Rule on Regulatory Capital, Capital Plan, and Stress Test Rules ("2020 Rule").  Each of the four actions is arbitrary and capricious and fatally flawed as a matter of law, because the Board failed to adopt a transparent and legally compliant process for the stress tests, and failed to adequately respond to commenters who pointed out fundamental problems with the Board's approach.

### 1.     In 2017, the Board proposes the Scenario Policy Statement, the Stress Testing Policy Statement, and the Enhanced Model Disclosure Document

53.     On December 15, 2017, the Board published notices of proposed rulemaking for the first three agency actions.

54.     The first, the Scenario Policy Statement, was intended to "modify" the process for developing the stress-test scenarios and "to enhance the . . . transparency of the Board's scenario design framework."  82 Fed. Reg. 59,533, 59,535/2 (Dec. 15, 2017).  The Board had previously published a high-level description of how it developed the annual scenarios, but was considering

---

[2] Valerie Hernandez, *What the Fed's Latest Stress Test Says About the U.S. Banking Sector's Resilience*, International Banker (Aug. 12, 2024), https://internationalbanker.com/banking/what-the-feds-latest-stress-test-says-about-the-us-banking-sectors-resilience/.

changes to its approach. *Id.* at 59,534/2, 59,535/2; *see* 78 Fed. Reg. 64,153 (Oct. 28, 2013). Accordingly, the proposed rule sought comment on several methodological revisions, such as the possibility of providing "more specific guidance for the change in unemployment rate when the stress test is conducted during a period in which the unemployment rate is already elevated," or adding variables that "capture the cost of funds" for banking organizations. 82 Fed. Reg. at 59,536/2, 59,537/3.

55.     The second agency action, the Stress Testing Policy Statement, was meant to explain "the Board's approach to the development, implementation, and validation of models used in the supervisory stress test." 82 Fed. Reg. 59,528, 59,528/2 (Dec. 15, 2017). The proposed Stress Testing Policy Statement, which was a total of four pages long, purported to lay out the "principles," "policies," and "procedures" used by the Board in developing the models. For instance, one such principle is "independence": The models are developed "internally and independently" by the Board, and they do not "rely on models or estimates provided by covered companies." *Id.* at 59,530/1. Another principle is that the models are "forward-looking," generating projections of potential losses and revenues over the next few years instead of analyzing historical data. *Id.* at 59,530/2. As another example, the Board says it prioritizes "consistency" by "us[ing] the same set of models and assumptions to produce loss projections for all covered companies." *Id.* at 59,530/2–3.[3]

56.     As these examples demonstrate, the Policy Statement was framed at a very high level of generality. The Statement did not provide any specific information about the models'

---

[3] The Board made minor revisions to the Stress Testing Policy Statement in 2020 and 2021. Those revisions are not relevant to the issues in this case.

content or assumptions that would allow commenters to test the models' reliability, provide meaningful input on their design, or propose specific changes to improve them.

57.     The "policies" and "procedures" set forth in the Stress Testing Policy Statement likewise shed little light on the content of the models.  In two short paragraphs, the Board vowed to pursue "soundness in model design" by subjecting the models "to extensive review of model theory and logic and general conceptual soundness."  82 Fed. Reg. at 59,531/1.  Yet the Board did not share any specifics about its process for ensuring the soundness of the models—much less about the theory and logic that were supposedly sound.  The Board also reserved the right to "revise its supervisory stress test models," and noted that "[r]evisions to the supervisory stress test models may at times have a material impact on modeled outcomes"—that is, the results of the stress tests and the capital that must be held.  *Id.* at 59,531/2.

58.     The third document published in December 2017 was titled "Enhanced Model Disclosure."  82 Fed. Reg. 59,547 (Dec. 15, 2017).  This document invited comments on whether the Board should more fully disclose its stress-test models.  The Board began by acknowledging the "significant public benefits" of transparency.  *Id.* at 59,547/3.  The limited information that the Board had already disclosed increased "public and market confidence in the process," and "[m]ore detailed disclosures could further enhance the credibility of the stress test by providing the public with information on the fundamental soundness of the models."  *Id.*  In addition, the Board admitted that disclosure would "facilitate comments on the models from the public, including academic experts," which would "lead to improvements" in the models.  *Id.*  Transparency would also "further[] the goal of maintaining market and public confidence in the U.S. financial system," and it

would help regulated entities "understand the capital implications of changes to their business activities." *Id.* at 59,547/3, 59,548/1.[4]

59.     Next, the Board described what it perceived to be the "material risks associated with fully disclosing the models to the firms subject to the supervisory stress test."  82 Fed. Reg. at 59,548/1.  The Board speculated that "firms could conceivably use [the models] to make modifications to their businesses that change the results of the stress test without changing the risks they face."  *Id.*  In such a case, the Board theorized, "the stress test could give a misleading picture of the actual vulnerabilities faced by firms."  *Id.*  Another supposed risk was that full model disclosure could "increase correlations in asset holdings among the largest banks, making the financial system more vulnerable to adverse financial shocks."  *Id.*  And it might also "incent banks to simply use models similar to the Federal Reserve's, rather than build their own," which would create a "model monoculture" and "miss key idiosyncratic risks faced by the firms."  *Id.*

60.     After articulating these considerations, the Board proposed that it would not disclose the models to the public.  *See* 82 Fed. Reg. at 59,548/1.  Instead, it proposed three targeted changes to the current disclosures.  These changes were: (1) a fuller description of the models, including a list of certain "key variables," (2) estimated loss rates for certain kinds of loans, and (3) portfolios of hypothetical loans and the estimated loss rates associated with each.  *Id.* at 59,548/2–3, 59,549/1.

61.     Given the number of factors in the statistical models behind the stress tests, these so-called "enhanced disclosures" provide insufficient insight into how the models actually operate

---

[4] The Board later decided to voluntarily release additional information about the stress-testing methodology on an annual basis.  *See, e.g.*, Board of Governors of the Federal Reserve System, *2024 Supervisory Stress Test Methodology* (Apr. 12, 2024).  But as explained above, *supra* ¶¶ 7, 9, 43–47, those disclosures remain insufficient to provide banks with notice regarding the standards by which they are judged.

and how they will apply to a particular firm in any given year. They are inadequate to enable the public to fully discern the specifics of the Board's models, identify flaws, or propose changes to improve the models. Ultimately, they leave the public in the dark as to the standards by which their obligations will be determined, failing to provide the fair notice to which firms are entitled.

### 2. Commenters request greater transparency in the stress-test process

62. Commenters, including BPI's two predecessor organizations, The Clearing House Association and the Financial Services Roundtable ("FSR"), identified flaws in all three proposals. *See, e.g.*, The Clearing House, Comment Letter on the Stress Testing Framework: Increased Transparency Proposal Package (Jan. 22, 2018) ("The Clearing House Comment Letter on 2019 Rules"); Financial Services Roundtable, Comment Letter on Enhanced Disclosure of the Models Used in the Federal Reserve's Supervisory Stress Test, Stress Testing Policy Statement, and Policy Statement on the Scenario Design Framework for Stress Testing (Jan. 22, 2018) ("FSR Comment Letter on 2019 Rules").

63. For example, commenters explained that all aspects of the scenarios and the models should be fully disclosed and subjected to the notice-and-comment process required by the APA. The Clearing House Comment Letter on 2019 Rules at 2. Commenters also explained that full disclosure would improve the quality and credibility of the stress tests. *Id.* at 1–2; *see also* FSR Comment Letter on 2019 Rules 3–6 (proposing specific disclosures that would reduce uncertainty and volatility for regulated parties).

64. The Clearing House also pointed out that the statistical models necessarily "reflect assumptions about the overall performance of the economy and different asset classes" used to establish "the very set of standards used to determine whether banks pass or fail the stress tests." The Clearing House Comment Letter on 2019 Rules at 9. In other words, the models incorporate

a series of policy judgments that have "significant economic consequences" for regulated parties. *Id.* at 9–10.

65. Commenters also explained why the Board's stated reasons for not fully disclosing the models lacked merit. For example, The Clearing House noted that it was "untenable" for the Board to maintain that its regulatory regime must be kept secret "because those subject to the regime might align their behavior with its rules and standards." The Clearing House Comment Letter on 2019 Rules at 10. Acting in conformity with a regulation "is not 'gaming' or 'reverse engineering'; it is obedience and compliance." *Id.*

66. Nor could a bank improve its performance on the stress tests without undertaking a longer-term change in its risk profile. The Clearing House Comment Letter on 2019 Rules at 10–11. As a practical matter, it is impossible for banks to "divest and shortly thereafter re-acquire large portfolios of assets, which are highly likely to be relatively illiquid." *Id.* at 11. Additionally, banks are subject to other regulatory requirements that make this sort of manipulation of a bank's risk profile difficult. Even if that were a realistic strategy, "the Board could easily identify and address any actions of this nature through its routine monitoring and supervisory activities." *Id.* And to the extent that the Board was concerned about banks using the models to make longer-term adjustments to their holdings, that "would suggest potential weaknesses in the models themselves, rather than a problem with disclosing them." *Id.* If the models accurately identify the relevant risks, conformance with the model (and thus better performance on the stress tests) should in fact reflect a lower risk profile. *Id.* The best way to address any concerns to the contrary would be to make the models "as accurate and effective as possible"—a goal that would be furthered, not hindered, by notice-and-comment rulemaking. *Id.*

67. The Clearing House addressed the Board's assertion that publication of the models would lead to greater correlation in holdings across U.S. banks. Once again, the flaw with this rationale is that, if the models are properly designed, "any resulting concentration would reflect a shift across the industry towards assets that are less susceptible to loss under stress." The Clearing House Comment Letter on 2019 Rules at 11.

68. Finally, in response to the Board's purported concern about a "model monoculture," The Clearing House explained that other regulations already require banks to develop proprietary models tailored to their particular risk profiles. The Clearing House Comment Letter on 2019 Rules at 10–11; *see* 12 C.F.R. §§ 252.54, 252.56. In fact, in late 2023, the Board and other banking regulators proposed highly detailed, binding capital standards for banks without ever suggesting that publicly disclosed binding standards would weaken rather than fortify bank stability.

### 3. In 2019, the Board adopts the proposed rules largely unchanged

69. On February 28, 2019, the Board issued the final version of all three rules.

70. When it came to the question of transparency (or the lack thereof), the final rules tracked the proposals closely—they did not disclose any additional information about the scenarios or the models beyond what was proposed, and offered little by way of further justification or response to commenters.

71. In the final Scenario Policy Statement, the Board noted that commenters sought to have the scenarios published for notice and comment. 84 Fed. Reg. at 6,654/3. The Board responded simply that it was "considering these comments and weighing the costs and benefits of publishing the scenarios for comment." *Id.* The Board did not explain what these costs and benefits would be, or otherwise respond to commenters' concerns.

72. The final Stress Testing Policy Statement did not mention publication of the models or the possibility of notice and comment at all. *See generally* 84 Fed. Reg. 6,664 (Feb. 28, 2019).

73.     As for the final Enhanced Model Disclosure Document, the Board repeated its prior rationalizations for keeping the models secret, including supposed concerns about banks manipulating their holdings to perform well on the stress tests, copying the Board's models, and increasing correlations in their asset holdings.  84 Fed. Reg. at 6,785/2–3.  The Board briefly acknowledged that commenters favored publication of the models for notice and comment, but it repeated its view that the initial proposal struck "[the] appropriate balance" between the "costs and benefits of disclosure."  *Id.* at 6,786/2.  The Board did not respond to any of the specific points raised by commenters, who had explained why none of the Board's reasons for keeping the models secret could withstand scrutiny.

### 4.     In 2020, the Board alters its framework for determining a bank's capital requirements to expressly incorporate the results of the stress tests

74.     The Board formally incorporated the results of the stress tests into banks' capital requirements in a rulemaking in 2020.

75.     On April 25, 2018 (while the three rulemakings above were still ongoing), the Board announced a proposal to formally integrate the stress tests into the Board's process for setting banks' capital requirements.  83 Fed. Reg. 18,160, 18,163/1 (Apr. 25, 2018).  The Board explained that it planned to use the stress tests "to size each firm's stress buffer requirements," after which the firm would need to maintain capital ratios above these requirements "to avoid restrictions on its capital distributions and discretionary bonus payments."  *Id.* at 18,164/2.

76.     Commenters again highlighted the need for greater transparency in the stress-test process.  *See, e.g.*, The Clearing House, Comment Letter on Proposed Amendments to the Regulatory Capital, Capital Plan and Stress Test Rules (June 25, 2018) ("Comment Letter on 2020 Rule").  The Clearing House argued that the scenarios "should be subject to the public notice-and-

comment process to increase transparency," and that they should be published earlier in the stress-testing cycle to assist banks in their planning. *Id.* at 7–8.

77.     The Clearing House also requested that the Board more clearly articulate its parameters for designing the scenarios, to "avoid excessive and unrealistic volatility from year to year." Comment Letter on 2020 Rule at 9. Such transparency would "allow firms to operate with more reasonable operations buffers, to engage more effectively in capital management and planning to comply with their point-in-time capital requirements and to more specifically comment on the supervisory scenarios and scenario components, effectively increasing the Federal Reserve's accountability." *Id.* In addition, disclosure would "provide greater credibility for the Federal Reserve's capital and stress testing framework." *Id.*

78.     The Clearing House noted that, in prior rulemakings, it had "consistently maintained" that transparency should be provided, and it argued that the Board should consider adopting those recommendations. Comment Letter on 2020 Rule at 10–11 & n.17.

79.     The Board published the final rule in the Federal Register on March 18, 2020, with an effective date of May 18, 2020. 85 Fed. Reg. 15,576 (Mar. 18, 2020) ("2020 Rule"). The 2020 Rule did not respond to any of The Clearing House's points about public disclosure. The preamble noted that several commenters had "raised concerns about potential volatility in capital requirements as a result of the Board's stress testing framework," and that commenters had suggested the solution of "publishing each year's severely adverse scenario for notice and comment" "to reduce the uncertainty associated with capital requirements." *Id.* at 15,580/3. The Board dismissed these concerns, reasoning simply that "[s]ome degree of volatility is inherent in risk-based capital requirements." *Id.* The Board also said it would further study ways to mitigate unnecessary volatility.

80. In maintaining that further disclosure of the scenarios was unnecessary, the Board pointed to its 2019 Scenario Policy Statement, which the Board said had been "intended to increase the transparency of the stress testing program." 85 Fed. Reg. at 15,581/1. The Board also stated vaguely that, "[r]egarding the publication of scenarios for comment, the Board is considering these comments and weighing the benefit of increased transparency against the costs, including, increased risk of window-dressing by firms and reduced flexibility by the Board to respond to salient risks." *Id.* at 15,581/1–2. To date, however, there have been no Board proceedings to address allowing notice and comment on the scenarios.

81. The 2020 Rule gave even less attention to the need for disclosing the models underlying the stress tests. The Rule noted that commenters had urged the Board to "enhance the transparency of the models used in the supervisory stress test by publishing model specifications for comment, or publishing its methodology for comment each year." 85 Fed. Reg. at 15,589/2. The Board responded simply that "the Board's methodology for conducting the supervisory stress test was not part of the proposal." *Id.* at 15,589/3. The Board also claimed that it had already taken all necessary "steps to respond to these comments" in its 2019 rulemakings. *Id.*

**D.** **Volatility In The Board's Stress Tests Has Led To Unwarranted Volatility In Banks' Capital Requirements**

82. Under the regime created by the 2020 Rule and in combination with the stress tests, banks experience significant and unpredictable volatility in their capital requirements, often principally as a result of (undisclosed) changes in the Board's methodology. For example, in 2022, the Board made changes to the scenarios and the models that had substantial spillover effects on regulated banks. BPI's economists estimated that the changes increased the aggregate stress-capital buffer by 40 basis points (and 60 basis points for global systematically important banks, or G-SIBs), all without any "actual increased risk in the portfolios of banks." Francisco Covas, Katie

Collard, and Jose Maria Tapia, Bank Policy Institute, *DFAST 2022: Volatility, Capital Increases, and the Implications for the U.S. Economy* (June 27, 2022).

83. The impact of these increases is immense. Every tenth of a percent translates into *billions* of dollars in additional capital that U.S. banks are required to maintain. Experts thus estimate that these undisclosed changes to the methodology of the 2022 stress tests increased minimum capital requirements by $55 billion for three of the largest U.S. banks alone. Guowei Zhang and Peter Ryan, Securities Industry and Financial Markets Association, *U.S. Stress Test Capital Requirements Are Excessively Volatile and Overestimate Losses* (Oct. 6, 2022).

84. This volatility is not unique to 2022. In 2019, BPI economists studied the differences between the results of the Board's stress tests and banks' internal stress tests—which use the same scenarios. *See* Francisco Covas, Paul Calem, and Adam Freedman, Bank Policy Institute, *Reducing Spurious Volatility in the Federal Reserve's Supervisory Stress Tests* (Oct. 16, 2019). The analysis found that "the Fed and banks' own projections often disagree on the year-over-year change in capital requirements." *Id.* at 3. In fact, the correlation between the two projections was a mere 25 percent. *Id.* Changes in capital requirements under the Board's models were "about twice as volatile" as changes under the banks' internal models. *Id.* This discrepancy indicates that the Board's models may be "excessive[ly] sensitiv[e]," and that errors or biases in the models— not changes in the annual scenarios or real-world risk to banks in the event of adverse economic conditions—are a driving factor in the volatility of capital requirements. *Id.* at 4. Because of the models' flaws, the results are not reliable indicators of actual risk to the banking system. At minimum, the anomalies created by the Board's models show why it is crucial that the public be permitted to review the models, identify the potential causes of the unexpected results they generate, and suggest improvements for consideration by the Board.

85.     The 2024 stress tests were similar.  More than half of banks saw increases in their capital requirements due to the 2024 tests.  Nearly one-third of banks saw stress-capital buffer increases of 70 basis points or more; three banks saw increases exceeding two hundred basis points. For a single bank, the size of capital increases seen as a result of the stress tests could translate into tens of billions more that the bank must retain on its balance sheet and may not lend into the real economy, deploy in capital market intermediation, or disburse to shareholders.  These unpredictable increases also lead banks to hold "uncertainty buffers" of extra capital—rather than deploying that capital into the economy, supporting growth and investment—so the banks are better positioned to quickly meet the volatile increases in their buffer requirement.  And the reasons for these increases cannot be discerned, in part because of the secrecy of the Board's models.  This volatility can require banks to hold billions of dollars in extra capital as a prophylactic measure, which has tangible real-world consequences in the form of reduced lending and other economic activity.

86.     As a result, and as the U.S. Chamber has noted in commenting on the stress-testing policy framework, there is "[e]vidence that stress testing may be driving steep declines in small business lending."  U.S. Chamber of Commerce, Center for Capital Markets Competitiveness, Comment Letter on the Stress Testing Framework: Increased Transparency Proposal Package 2–3 (Jan. 22, 2018); *see also id.* at 4–5 (citing three economic studies).  This has substantial effects on the economy as a whole, since small businesses are a "key driver of individual and community economic mobility" in the United States, and they "depend on access to financing to get started, sustain operations, manage cash, make payroll, and create well-paying jobs."  *Id.* at 3–4.  As the U.S. Chamber further explained, "[a]dditional transparency in the stress testing program would allow experts to perform a substantially more informed assessment of the relationship between

stress testing and small business lending," thus enabling the Board "to adequately balance the costs and benefits flowing from its regulatory and supervisory choices." *Id.* at 5.

### E. The Schedule For Annual Stress Tests

87. Each year, the Board's process for conducting stress tests follows an established, fairly consistent schedule.

88. The Board publishes the scenarios "no later than February 15." 12 C.F.R. § 252.44(b).

89. By April 5, covered entities must report their capital plans to the Board. The capital plans must include "an assessment of the expected uses and sources of capital over the planning horizon," including "[e]stimates of projected revenues, losses, reserves, and pro forma capital levels, including regulatory capital ratios, and any additional capital measures deemed relevant by the bank holding company, over the planning horizon." 12 C.F.R. § 225.8(e)(1)(ii), (e)(2). Throughout the year, banks also submit other financial information that the Board uses for the stress tests, as explained above.

90. From April through June, the Board uses the banks' information to conduct the supervisory stress tests.

91. By June 30, the Board advises each firm of its required stress-capital buffer for the coming year, as determined by the stress tests. The tests' final results are also disclosed to the firms, although not how the firm was judged in specific areas, such as operational risk. 12 C.F.R. §§ 225.8(h), 252.46(b). The stress-test results are reported to the public by June 30, and the final stress-capital buffers are reported by August 31. *See id.* § 225.8(h)(1), (4)(i).

92. On October 1, the stress-capital buffer becomes effective. 12 C.F.R. § 225.8(h)(4)(ii).

93.    While this lawsuit challenges the scenarios and models used in 2024 to set banks'
capital requirements as well as the forthcoming scenarios and models that will do the same thing
next year and in future years, it does *not* seek to disrupt or undo the stress-capital buffer that took
effect for banks in October 2024, or the stress-test cycle for 2025, which will commence early next
year.  Instead, this lawsuit seeks changes that would take effect no later than the cycle that will
take place in 2026.

**F.    The Recent Controversy Surrounding the Board's Proposed Capital Rules**

94.    The Board's recent experience with another proposed rule involving capital re-
quirements illustrates the importance of the Board adopting and amending the annual capital buffer
and stress-test standards through the notice-and-comment process required by the APA.

95.    In September 2023, the Federal Reserve, Federal Deposit Insurance Corporation,
and Office of the Comptroller of the Currency jointly proposed a rule to amend capital require-
ments for large banks in accordance with the standards of the 2017 Basel Committee (a global
organization that designs prudential standards for regulating banks).  *See* 88 Fed. Reg. 64,028
(Sept. 18, 2023).

96.    Like the stress tests and the stress-capital buffer, the proposed capital rules are in-
tended to ensure that banks have sufficient capital to guard against various risks.  And like the
stress tests and the resulting capital buffer directives, the proposed capital rules would have a mas-
sive economic impact.  According to one economist, they would increase capital requirements by
16 percent, which translates to approximately $180 billion in additional capital that banks must
hold.  Professor Anthony Saunders, Comment Letter on Regulatory Capital Rule: Amendments to
Large Banking Organizations and to Banking Organizations with Significant Trading Activity 1–
3 (Jan. 12, 2024).

97.     Unlike the stress tests, however, the proposed capital rules were put forward in a notice-and-comment rulemaking that enabled interested parties to see the formulae the bank regulators would use to assess bank risks and to determine the capital that banks should hold to guard against those risks.

98.     Public response to the proposed capital rules was telling.  Because in this case the government's proposed "models" were public, interested parties were able to evaluate them and identify serious substantive and procedural flaws in the proposed approach—including major flaws in the risk weights and formulae that the regulators sought to use in determining banks' new capital requirements.  One study concluded that, of the 356 comments that were submitted in response, "more than 97%" "opposed the Proposal in full or raised substantial concerns with parts of it." Latham & Watkins LLP, *Comments on the Basel III Endgame Proposal: Opposition and Significant Concerns Dominate the Record* 2 (Feb. 2, 2024).  The criticism came from a broad and diverse set of commenters, including not just the banks and bank trade associations, but small businesses, manufacturers, entities representing the agriculture, consumer goods, energy, hospitality, housing and real estate, insurance, media, steel and aluminum production, telecommunications, and transportation industries, members of Congress from both major political parties, state and local representatives, civil-rights advocates, union executives, and academics.  *Id.* at 24–30.

99.     The Board's Chairman later indicated that the public's participation in the rulemaking would have a major impact on the Board's ultimate approach.  He testified to Congress, "We do hear the concerns and I do expect there will be broad and material changes to the proposal." *Hearing Entitled: The Federal Reserve's Semi-Annual Monetary Policy Report*, Financial Services Committee, https://tinyurl.com/mvxtus6c (at 56:45–59:57, 2:09:23–2:14:40).  And he reiterated the Board's "commit[ment] to doing transparent, and reasonable, and data-based rulemaking in

compliance with the Administrative Procedure Act." *Id.* The Board's Vice Chairman for Supervision similarly stated that the Board was "taking th[e] comments into account" and expected to "have a set of broad, material changes to the rule that allow us to have a broad consensus." Bob Needham, *Federal Reserve's Michael Barr Discusses Health of Banking System, SVB Failures, and More at Michigan Law Conference*, University of Michigan (Apr. 5, 2024).

100. Meanwhile, nowhere in the proposed 2023 capital rules did the Board or any other bank regulator suggest that bank stability would be threatened if the standards by which the government evaluated bank risk, and set capital requirements, were publicly disclosed in accordance with law.

101. In 2024, the magnitude of the changes to the stress-capital buffer dictated by the stress tests had an impact on banks comparable to the impact that would have been caused by the bank regulators' controversial 2023 capital rules proposal. But because the Board adopts and amends its standards for the stress-capital buffer in secret, both the public and the Board are deprived of the benefits of notice and comment. Were the Board to comply with the APA and allow interested parties to review proposed stress-test standards and comment on them, the Board would likely make important changes to its approach, similar to what the Board's Chair indicated will happen with the Board's other proposed capital rules.

### COUNT ONE (2024, 2025, and 2026 Stress-Test Scenarios)

### ADMINISTRATIVE PROCEDURE ACT: FAILURE TO PROVIDE NOTICE AND COMMENT

102. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

103. The APA requires that agencies use notice-and-comment rulemaking whenever they issue a new legislative rule. 5 U.S.C. § 553. A rule is legislative if it has the "force and effect of law." *Mann Constr.*, 27 F.4th at 1143.

104.    The annual stress-testing scenarios are an integral component of rules that have the force and effect of law, and are rules themselves. The Board uses the scenarios to determine a bank's stress-test results. The stress-test results, in turn, dictate the bank's stress-capital buffer. And the stress-capital buffer is a binding legal obligation: if the bank does not hold sufficient capital, it faces immediate legal consequences, including restrictions on capital distributions and discretionary bonus payments.

105.    In 2024, the Board developed the scenarios without notice-and-comment rulemaking and with no opportunity for regulated parties to provide input.

106.    Under the scheme established in the 2019 Policy Statements and the 2020 Rule, the Board will use the same process to develop the scenarios for the 2025 and 2026 stress tests.

107.    Plaintiffs are therefore entitled to relief under the APA and other applicable law.

### COUNT TWO (2024, 2025, and 2026 Stress-Test Models)

### ADMINISTRATIVE PROCEDURE ACT: FAILURE TO PROVIDE NOTICE AND COMMENT

108.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

109.    Like the scenarios, the annual stress-testing models are an integral component of rules that have the force and effect of law, and are rules themselves. When an agency develops a model and "treat[s] the model as a binding norm" to determine the rights and obligations of regulated parties, the model is a legislative rule that must be subject to notice-and-comment rulemaking. *McLouth Steel Prod. Corp. v. Thomas*, 838 F.2d 1317, 1320, 1322 (D.C. Cir. 1988).

110.    Using financial information collected from banks, the Board uses the models (in combination with the annual scenarios) to determine each bank's stress-test results. The Board then treats those results as determinative of banks' stress-capital buffer, a binding legal obligation imposed by the Board on individual banks.

111. Moreover, in developing the stress-test models, the Board makes important policy judgments, including how different types of assets and liabilities affect a bank's risk profile, the proper measure of the impact on that risk profile, and the capital buffer needed to absorb that impact.

112. In 2024, the Board used models that it had developed and changed without notice-and-comment rulemaking.

113. Under the scheme established in the 2019 Policy Statements and the 2020 Rule, the Board will use the same process to develop and change the models for the 2025 and 2026 stress tests.

114. Plaintiffs are therefore entitled to relief under the APA and other applicable law.

## COUNT THREE (2024, 2025, and 2026 Stress-Test Models)

### ADMINISTRATIVE PROCEDURE ACT: PUBLICATION REQUIREMENT FOR RULES

115. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

116. Section 552(a) of the APA provides that agencies "shall . . . publish in the Federal Register" "substantive rules of general applicability," "statements of general policy or interpretations of general applicability," and "each amendment, revision, or repeal of the foregoing." 5 U.S.C. § 552(a)(1)(D), (E). If regulated parties lack "actual and timely notice" of "a matter required to be published in the Federal Register [which is] not so published," they "may not in any manner be required to resort to, or be adversely affected by" the agency action in question. *Id.* § 552(a).

117. The 2024 stress-test models—and any revisions to the models—fall within the scope of this publication requirement. The models are applied to all banks that submit to supervisory stress tests, and they are integral to determining the legal obligations of those banks. Thus,

the models are integral to "substantive rules of general applicability" and are such "substantive rules" themselves.  5 U.S.C. § 552(a)(1)(D), (E).

118.    Under the scheme established in the 2019 Policy Statements and the 2020 Rule, the 2025 and 2026 stress-test models—and any revisions to the models—will also fall within the scope of this publication requirement.

119.    The Board has never published the stress-test models, and indeed, has withheld critical information about how they operate.  The Board makes substantive revisions to the models on a regular basis without prior notification to regulated parties, who only learn of the changes when the Board reports their stress-capital buffer requirements and stress test results at the end of the process.

120.    Plaintiffs are therefore entitled to relief under the APA and other applicable law.

### COUNT FOUR (2024, 2025, and 2026 Stress-Test Models)

### FAIR-NOTICE DOCTRINE

121.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

122.    Under the Due Process Clause of the Fifth Amendment, "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *Fox Television Stations*, 567 U.S. at 253; *see* U.S. Const. amend. V.  "'[I]n the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability.'"  *Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618, 628 (D.C. Cir. 2000).

123.    An agency action that "entails the expenditure of significant amounts of money, deprives [the regulated party] of property no less than a fine."  *United States v. Chrysler Corp.*,

158 F.3d 1350, 1354–55 (D.C. Cir. 1998). Thus, such actions trigger the constitutional "duty to provide notice." *Id.*

124. The Board's stress-test models for 2024 imposed capital requirements on banks without fair notice of how those requirements are calculated. The capital requirements constitute a deprivation of property because they restrict the distributions that banks may make and otherwise limit banks' control over their own assets.

125. Under the scheme established in the 2019 Policy Statements and the 2020 Rule, the Board's stress-test models for 2025 and 2026 will also impose capital requirements on banks without fair notice of how those requirements are calculated.

126. Plaintiffs are therefore entitled to relief under the APA, the Due Process Clause, and other applicable law.

## COUNT FIVE (2019 Scenario Policy Statement)

### ADMINISTRATIVE PROCEDURE ACT

127. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

128. When agencies engage in notice-and-comment rulemaking, they are required to consider and appropriately respond to the public's "submission of written data, views, or arguments." 5 U.S.C. § 553(c). In the final rule, the agency must demonstrate that it has considered all significant comments that were raised during the rulemaking process. *Ohio*, 144 S. Ct. at 2054. Mere acknowledgment of commenters' objections is insufficient; instead, the agency must offer a "reasoned response." *Id.* An agency action that does not meet this standard is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and must be "h[eld] unlawful and set aside." 5 U.S.C. § 706(a).

129. The Scenario Policy Statement did not provide a reasoned basis for the agency's action. For example, and without limitation, the Board failed to adequately consider publishing the scenarios for notice and comment, or to respond cogently to rulemaking comments on that point. In response to commenters who sought publication, the Board said only that it was "considering these comments and weighing the costs and benefits of publishing the scenarios for comment." 84 Fed. Reg. at 6,654/3.

130. Plaintiffs are therefore entitled to relief under the APA and other applicable law.

**COUNT SIX**

**(2019 Stress Testing Policy Statement and Enhanced Model Disclosure Document)**

**ADMINISTRATIVE PROCEDURE ACT**

131. Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

132. The 2019 Stress Testing Policy Statement and the 2019 Enhanced Model Disclosure Document also failed to provide a reasoned basis for the agency's actions. For example, and without limitation:

    a. In declining to publish the models and subject them to notice-and-comment rulemaking, the Board arbitrarily and unlawfully relied on the justification that regulated parties would adjust their behavior to comply with the regulatory standards being applied to them.

    b. The Board failed to adequately consider the benefits of notice-and-comment rulemaking for the models, including and without limitation, expert input into the models, an improvement in the models' accuracy and effectiveness, and a shift across the industry towards assets that are less susceptible to loss under stress.

    c.   The Board did not provide a reasoned response to the concerns raised by comment-ers, including and without limitation, that the stated reasons for refusing to publish the models indicated that the models do not accurately judge risk.  Instead, the agency "sidestep[ped]" those concerns.  *Ohio*, 144 S. Ct. at 2055.

133.    Plaintiffs are therefore entitled to relief under the APA and other applicable law.

## COUNT SEVEN (2020 Rule)

### ADMINISTRATIVE PROCEDURE ACT

134.    Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

135.    The 2020 Rule also failed to provide a reasoned basis for the agency's action.  For example, and without limitation:

    a.   The Board failed to adequately consider the benefits of publishing the scenarios for notice and comment, including and without limitation, reduced uncertainty for reg-ulated parties and a decrease in the volatility of annual capital requirements.

    b.   In response to commenters' request for publication of the models, the Board made the arbitrary and non-responsive statement that "the Board's methodology for con-ducting the supervisory stress test was not part of the proposal."  85 Fed. Reg. at 15,589/3.

136.    Plaintiffs are therefore entitled to relief under the APA and other applicable law.

### PRAYER FOR RELIEF

137.    For these reasons, Plaintiffs respectfully request entry of an order and judgment:

    a.   Declaring that the stress-test models and scenarios used by the Board in 2024, and that will be used by the Board in 2025 and 2026, are legislative rules, and integral

components thereof, that were required to be subject to notice-and-comment rule-making;

b. Declaring that the stress-test models for 2024, 2025, and 2026 are required to be published under the APA, and that the models must be republished whenever they are "amend[ed]" or "revis[ed]";

c. Requiring that before the Board initiates stress testing for 2026, it conduct notice-and-comment rulemaking for the stress-test models and scenarios in conformity with the APA, and publish the final models and scenarios in conformity with the APA;

d. Enjoining the further use of stress-test models and scenarios to establish capital requirements in 2026 and thereafter, if the models and scenarios were not adopted using notice-and-comment rulemaking or were not published;

e. Vacating and setting aside the Scenario Policy Statement, the Stress Testing Policy Statement, the Enhanced Model Disclosure Document, and the 2020 Rule, with such relief to take effect in 2026 and thereafter;

f. Awarding Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action under 28 U.S.C. § 2412 or other applicable law; and

g. Granting such other and further relief as this Court deems just and proper.

Dated: December 24, 2024

Respectfully submitted,

/s/ James A. King
James A. King (No. 0040270)
Trial Attorney
PORTER WRIGHT MORRIS & ARTHUR LLP
41 South High Street, Suites 2800 - 3200
Columbus, OH 43215
Telephone:    (614) 227-2051
Facsimile:    (614) 227-2100
jking@porterwright.com

Eugene Scalia*
Matt Gregory*
Max E. Schulman*
Giuliana C. Cipollone*
Olivia R. Goldberg*
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone:    (202) 955-8500
Facsimile:    (202) 467-0539
escalia@gibsondunn.com
mgregory@gibsondunn.com
mschulman@gibsondunn.com
gcarozzacipollone@gibsondunn.com
ogoldberg@gibsondunn.com

*Attorneys for Plaintiffs Bank Policy Institute,
Ohio Chamber of Commerce, Ohio Bankers
League, American Bankers Association, and
Chamber of Commerce of the United States of
America*

Don Boyd (No. 0089180)
OHIO BANKERS LEAGUE
4215 Worth Avenue, Suite 300
Columbus, OH 43219
Telephone:    (614) 340-7595

*Attorney for Plaintiff Ohio Bankers League*

Tony Long (No. 0037784)*
OHIO CHAMBER OF COMMERCE
34 South Third Street, Suite 100
Columbus, OH 43215
Telephone:    (614) 228-4201

*Attorney for Plaintiff Ohio Chamber of Commerce*

| | |
|---|---|
| John Court* | Tyler S. Badgley* |
| Sarah Flowers* | Mariel A. Brookins* |
| BANK POLICY INSTITUTE | U.S. CHAMBER LITIGATION CENTER |
| 1300 Eye Street, N.W., Suite 1100 West | 1615 H Street, N.W. |
| Washington, D.C. 20005 | Washington, D.C. 20062 |
| Telephone:    (202) 289-4322 | Telephone:    (202) 463-5337 |
| | |
| *Attorneys for Plaintiff Bank Policy Institute* | *Attorneys for Plaintiff Chamber of Commerce of the United States of America* |

Thomas J. Pinder*
Andrew Doersam*
AMERICAN BANKERS ASSOCIATION
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone:    (202) 663-5035

*Attorneys for Plaintiff American Bankers Association*

*Application for admission *pro hac vice* forthcoming