# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| BANK POLICY INSTITUTE, OHIO CHAMBER OF COMMERCE, OHIO BANKERS LEAGUE, AMERICAN BANKERS ASSOCIATION, and CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,<br><br>　　　　　　Defendant. | Case No. 2:24-cv-04300<br><br>District Judge Algenon L. Marbley<br><br>Magistrate Judge Chelsey M. Vascura |

**BRIEF OF THE SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Brinton Lucas*
Nathaniel Sutton*
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
blucas@jonesday.com
nsutton@jonesday.com

Thomas Conerty
　Bar No. 101619
JONES DAY
325 John H. McConnell Boulevard
Suite 600
Columbus, OH 43215
　Phone: (614) 469-3939
　Fax: (614) 461-4198
　tconerty@jonesday.com

*Counsel for Amicus Curiae*

* Application for *pro hac vice* pending

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Rule 7.1.1, the Securities Industry and Financial Markets Association states that it is a non-profit corporation. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

*/s/ Thomas Conerty*
Thomas Conerty

*Counsel for Amicus Curiae*

**TABLE OF CONTENTS**

Page

CORPORATE DISCLOSURE STATEMENT ................................................................................. i
INTEREST OF AMICUS CURIAE .............................................................................................. 1
SUMMARY OF ARGUMENT .................................................................................................... 1
ARGUMENT ............................................................................................................................... 3
    I.    THE CURRENT STRESS-TESTING PROCESS PRODUCES ARBITRARY RESULTS WITH DETRIMENTAL EFFECTS ON THE NATION'S ECONOMY ................................. 3
        A.    Large Banks Are Critical Intermediaries In Our Financial System ........... 3
        B.    The Evolution Of Stress Testing Into A Comprehensive Regulatory Tool Underscores The Need For Public Input ............................................ 4
        C.    The Stress-Testing Process Generates Empirically Implausible Results .......................................................................................................... 6
        D.    The Board Forces Banks To Maintain Excessive Levels Of Capital, Limiting Their Ability To Support Domestic Markets ............................. 9
    II.    THE CURRENT STRESS-TESTING PROCESS VIOLATES THE APA ........................... 11
CONCLUSION .......................................................................................................................... 15
CERTIFICATE OF SERVICE .................................................................................................. 16

## INTEREST OF *AMICUS CURIAE*[*]

The Securities Industry and Financial Markets Association (SIFMA) is the leading trade association for broker-dealers, investment banks, and asset managers operating in the United States and global capital markets. On behalf of industry members and their one million employees, SIFMA speaks on legislation, regulation, and business policy affecting retail and institutional investors, equity and fixed income markets, and related products and services. SIFMA has a long track record of calling for greater transparency from the Federal Reserve Board when it conducts stress tests that set capital requirements for banks. SIFMA has prepared extensive research demonstrating that the current stress-testing process constrains its members' capacity to serve American businesses and households because it does not appropriately reflect risks and consequently imposes excessive capital requirements. Drawing on SIFMA's expertise in this area, this brief explains why the current process harms U.S. markets.

## SUMMARY OF ARGUMENT

Given their significant financial resources, large banks can provide funding to American families and businesses at levels that other institutions cannot. Whether it is a couple signing a mortgage for their first home, a startup seeking a loan to cover its initial costs, or a company asking to borrow additional funding to enter new markets, large banks play a critical role in facilitating the transactions that drive our Nation's economy. And traditionally, they enjoyed significant discretion in doing so. To a considerable extent, banks, rather than federal regulators, chose which market activities they would fund, whom they would serve, and how they would manage their capital levels.

---

[*] No counsel for a party authored this brief in whole or in part. No party, no counsel for a party, and no person other than *amicus*, its members, or its counsel made a monetary contribution intended to fund the preparation or submission of this brief.

1

But in recent years, the Federal Reserve Board has begun to micromanage the capital levels of large banks through stress tests—annual attempts to simulate a market downturn in order to determine how much capital each bank must hold. To be clear, there is nothing wrong with capital requirements or stress tests as a general matter. When used appropriately, they serve the important purpose of ensuring banks have enough capital to weather a recession or other unexpected losses. But for a stress test to serve that purpose, two things must be true. First, the test must reflect plausible market conditions. Second, the process must be transparent, so that banks can continuously maintain the capital levels that account for the risks identified and business realities.

Neither can be said about the Board's current stress-testing process. Rather, in accounting for implausible scenarios, that framework overstates the risk that banks are insufficiently capitalized. And using that inaccurate framework, the Board has forced banks to increase their capital to unprecedented levels without any transparent reasoning for doing so and thereby driven them out of certain market activities the Board deems too risky. What is more, the Board made these decisions behind closed doors. The Board has never sought public comment on its models and scenarios. Nor has it disclosed key information about how those models operate in the first place. Because banks do not know the bases for the Board's decisions, they cannot predict how their capital requirements will vary from year to year. So rather than adjust their distributions to reflect plausible risks, banks are forced to withhold additional capital from the markets to account for this yearly variance, to the detriment of American families and businesses alike.

These missteps were avoidable. Had the Board only solicited public feedback, it could have benefitted from SIFMA's research on stress testing. It could have learned of the flaws in its stress-testing approach that it failed to identify on its own initiative. And it could have better understood the economic consequences of overestimating risk in capital regulation.

Instead, the Board plowed ahead without the public, thereby running afoul of the Administrative Procedure Act (APA) in at least three respects. *First*, it failed to follow the APA's notice-and-comment process before developing the stress tests, thereby depriving it of valuable input from those affected. 5 U.S.C. § 553. *Second*, it failed to publish the stress-test models or their substantive revisions, thereby stumbling over another APA tripwire (and disregarding the constitutional requirement of fair notice). *Id.* § 552(a)(1)(D), (E); U.S. Const. amend. V. *Third*, it failed to provide a reasoned response to commenters' concerns, thereby producing arbitrary agency action. 5 U.S.C. § 706. This Court should rectify these blackletter administrative-law violations so that the Board can design a stress-testing process tailored to actual market risks and public input.

## ARGUMENT

### I. THE CURRENT STRESS-TESTING PROCESS PRODUCES ARBITRARY RESULTS WITH DETRIMENTAL EFFECTS ON THE NATION'S ECONOMY.

#### A. Large Banks Are Critical Intermediaries In Our Financial System.

Large banks play a major role in capital markets, which fund roughly three-quarters of U.S. economic activity. SIFMA, *Testimony on Stress Testing: What's Inside the Black Box* 2 (June 26, 2024), https://perma.cc/7HXN-AWJ6. They offer financing, market-making, and hedging services to an array of clients ranging from corporations to asset managers and smaller banks. International Swaps and Derivatives Association & SIFMA, *Re: Regulatory Capital Rule: Amendments Applicable to Large Banking Organizations and to Banking Organizations with Significant Trading Activity* 5 (Jan. 16, 2024), https://perma.cc/595J-D37G. These services help lower the cost of credit, stabilize prices, and promote investment in liquid and dynamic markets. *Id.*

Large banks also improve the quantity and quality of capital available. *See* Guowei Zhang et al., SIFMA, *Identifying an Optimal Level of Capital and Evaluating the Impact of Higher Bank Capital Requirements on US Capital Markets* (May 15, 2023), https://perma.cc/7DB2-TM8J; *see*

3

*also* AR-243, PageID#387 (Goldman Sachs, *Comment Letter on Proposed Amendments to the Regulatory Capital, Capital Plan and Stress Test Rules* 3 (June 25, 2018) (*Goldman Sachs Comment Letter*), https://perma.cc/QXN4-AAE3) (similar). Since the 2008 financial crisis, the amount of high-quality capital—that is, the type of capital which can best absorb losses, such as common shares and retained earnings—in the U.S. banking system has tripled. *See Regulatory Recipe for Economic Uncertainty: The Endless Basel Endgame and an Onslaught of Hurried Rulemaking Undertaken by the Administration*, Hearing Before the Subcomm. on Financial Institutions and Monetary Policy 1:06:46 (Sept. 25, 2024) (statement of Kenneth Bentsen) (*Bentsen Statement*). This means banks' financial resources are readily available and reliable, ensuring their stability and solvency during adverse economic conditions. In fact, U.S. bank holding companies are better capitalized now than at any other point in history. *See* Peter Ryan & Guowei Zhang, SIFMA, *How the Basel III "Endgame" Reforms Will Transform US Capital Requirements* (Feb. 27, 2023), https://perma.cc/6K83-MD2A. Senior policymakers at the Federal Reserve, including Janet Yellen, Jerome Powell, and Michael Barr, have therefore characterized the banking system as robust, resilient, and well-capitalized. *See Bentsen Statement* 1:06:55; AR-245, PageID#389 (*Goldman Sachs Comment Letter* 5). In fact, due to strong capital levels, the U.S. banking system made it through the COVID-19 pandemic without any large bank failures.

    **B.**    **The Evolution Of Stress Testing Into A Comprehensive Regulatory Tool Underscores The Need For Public Input.**

Despite their resilience to real-world economic shocks, large banks recently have faced increasing scrutiny from the Board wielding its authority under the Dodd-Frank Act to conduct stress tests. *See* 12 U.S.C. § 5365(i)(1)(A). As a general matter, a stress test tries to simulate how a bank will respond to an unexpected market shock. To that end, the Board designs scenarios that it claims reflect "severe but plausible" economic conditions and then feeds a bank's financial

information into those assumptions. Federal Reserve System, *Dodd-Frank Act Stress Test Publications: 2023 Stress Test Scenarios* (*2023 Stress Test Scenarios*), https://perma.cc/RL9H-WCVN. This framework is supposed to help project the bank's financial-statement information, including losses, revenues, expenses and capital levels, which in turn is used to determine how much capital the bank must hold. Congress designed this process to increase transparency to the market and enhance the safety and soundness of the U.S. banking system. *See* 12 U.S.C. § 5365(i)(1)(A), (B)(v).

The Board, however, has shrouded the current stress-testing framework in secrecy rather than following the APA's notice-and-comment process, which makes it difficult to evaluate whether its outputs actually enhance market safety and soundness. The Board changes its scenarios each year without any public input before applying them in supervisory stress tests. And, despite the abundance of sophisticated stakeholders in the banking industry, the Board has refused to seek public comment on its stress tests, models, and scenarios. In fact, it has not disclosed key information about the models at all.

One might expect that the Board would tread carefully given the lack of public input. Instead, it has marshalled its test results to justify unprecedented balance sheet micromanagement over large banks. In recent years, it has used stress testing to drive bank behavior by penalizing certain transactions, such as market-making activities, relative to others from a capital perspective. Stress testing has also been shown to restrict banking activities that affect millions of ordinary customers, including residential lending and small business lending. *See* SIFMA, *Rebalancing the Financial Regulatory Landscape* 10 (May 1, 2017), https://perma.cc/DFL5-LCX9; AR-142, PageID#286 (The Clearing House et al., *Comment Letter on Proposed Amendments to the Regulatory Capital, Capital Plan and Stress Test Rules* 5 (June 25, 2018) (*Clearing House*

5

*Comment Letter*), https://perma.cc/D3BD-2EN9); AR-250, PageID#394 (*Goldman Sachs Comment Letter* 10); The Clearing House, *Are the Supervisory Bank Stress Tests Constraining the Supply of Credit to Small Businesses?* 7 (May 11, 2017), https://perma.cc/2TF8-PCZL.

The Board insists that its penalties reflect the relative risks of transactions as identified in stress tests. *See* Federal Reserve System, *Statement on 2024 Stress Test Results by Vice Chair for Supervision Michael S. Barr*, https://perma.cc/6XHC-V4FF. But flyspecking the business decisions of large banks is a far cry from the limited purpose of stress testing—namely, to ensure that banks have sufficient capital to survive a recession. The transformation of stress testing into a means of comprehensive regulation underscores the need for an accurate and transparent process that comports with the APA's procedures.

C. **The Stress-Testing Process Generates Empirically Implausible Results.**

At present, however, the stress-testing process is neither accurate nor transparent. The Board's failure to even disclose its stress tests, much less seek legally required public input, has led it to design scenarios that do not reflect plausible economic conditions.

To illustrate the point, the Board regularly introduces new scenarios beyond the two scenarios mandated by Congress—namely, a "baseline" scenario and "severely adverse" scenario. 12 U.S.C. § 5365(i)(1)(B)(i). One of the Board's creations—a scenario called "Global Market Shock"—is meant to simulate a "severe recession" that triggers "a large set of risk factors." *2023 Stress Test Scenarios*. While the Board insists that this scenario reflects "plausible outcomes," the data do not bear out that claim. 12 C.F.R. § 252, App. A § 5.2.3(c). As SIFMA has warned the Board, "the assumptions" governing the Global Market Shock scenarios "appear to be illogical, resulting in exaggerated stress loss estimates that do not align with plausible assessments of market or counterparty risk." SIFMA, *Global Market Shock and Large Counterparty Default Study: Recommendations for Reforms Based on a Statistical Analysis of Stress Testing Scenarios* 4 (Aug.

6

2019) (*Global Market Shock Study*), https://perma.cc/THT2-5K8V; *see also* AR-143, PageID#287 (*Clearing House Comment Letter* 6) (similar). Indeed, multiple premises built into the Board's scenarios do not hold up under scrutiny.

For one, the scenarios hypothesize market movements that have never occurred together in the past and are highly unlikely to surface in the future. The Global Market Shock scenarios assume that most asset classes—even uncorrelated ones—will simultaneously experience their most adverse or near-most adverse performance simultaneously. *Global Market Shock Study* 8. In other words, they predict that most domestic markets will plummet in unison not *in response* to the shock but *as simultaneous causes* of the shock. To reach that startling conclusion, the Board had to assume that the vast majority of asset classes were highly correlated. *Id.* But even during extreme events, most asset classes operate independently of one another. While *some* asset classes respond similarly to economic shocks, the existence of a positive correlation depends on the class in question. *Id.* at 26. During the 2008 financial crisis, for instance, "adverse movements occurred on different dates," sometimes with "considerable gaps between these dates." *Id.* at 4. And even where a positive correlation exists, there is "no material evidence of simultaneous shifts in asset class performance in the magnitude represented by" the scenarios. *Id.* at 26. Markets do not react like dominoes, and the Board does not try to justify its contrary assumption in public.

For another, the scenarios fail to account for mitigating activities that banks would take following an adverse event. The Board assumes a "onetime shock" as opposed to a longer time horizon, and thus attempts to package the fallout of an adverse event into one hypothetical day. But banks do not have 24 hours to respond to a crisis. Instead, an adverse event plays out over weeks and months, giving banks time to adjust their capital activity. Most banks would turn to activities such as sales or hedging to reduce their exposure. *Id.* at 17 (explaining that these markets

7

are ordinarily available to banks following a material event). Because the scenarios do not account for mitigating activities, they overstate the risk of bank failure and the amount of capital that banks need to withstand a market shock. Even though SIFMA tried to raise this concern, the Board has refused to adjust its scenarios or even entertain public input via notice and comment. *Id.* at 18.

The Board's tests also produce extreme and random volatility on a year-to-year basis, thereby undermining their credibility and probative value. AR-142, PageID#286 (*Clearing House Comment Letter* 5). An accurate forward-looking model should not produce dramatic variation, but rather reflect subtle adjustments to emerging views of risk that are linked to feedback from the prior years' analysis. *Global Market Shock Study* 28. The Board, however, solicits limited public feedback and does not publish its scenarios until they have been executed. So banks cannot predict the capital requirements they will face, or even get an estimate. As the chart below shows, the Global Market Shock scenarios have produced dramatic swings in magnitude between 2013 and 2019. *Id.* at 29. In fact, some asset classes demonstrated directional flips on a year-to-year basis.



8

While a certain degree of variability in the magnitude of shocks is essential for a comprehensive stress-testing framework, these changes should remain within a reasonable range that reflects a broader, cohesive strategy to enhance the predictability of the capital planning process, thereby aiding improvements in risk management. *See* Guowei Zhang & Peter Ryan, SIFMA, *US Stress Test Capital Requirements Are Excessively Volatile and Overestimate Losses* (Oct. 6, 2022), https://perma.cc/A27S-CYU2; *see also* AR-143, PageID#287 (*Clearing House Comment Letter* 6) (similar). Otherwise, banks will respond by taking a capital position that is too conservative and correspondingly reduce their activities—such as lending—to avoid running afoul of the Board. *See* Francisco Cova et al., Bank Policy Institute, *DFAST 2022: Volatility, Capital Increases, and the Implications for the U.S. Economy* (June 27, 2022), https://perma.cc/32VN-FD9Q. If the Board had merely followed the APA's procedures, SIFMA could have helped it design an accurate framework that serves both the public and large banks. But the Board has pressed on in secret. Implausible scenarios that change at an agency's whim serve no appropriate supervisory function.

### D. The Board Forces Banks To Maintain Excessive Levels Of Capital, Limiting Their Ability To Support Domestic Markets.

Unpredictable and inaccurate stress tests threaten the vitality of domestic markets, with American businesses and households ultimately paying the price. Capital planning is a dynamic, forward-looking process, and banks are engaged in a constant capital-optimization exercise as they choose how to meet their capital requirements while engaging in their desired business activities. Banks therefore must plan multiple quarters ahead when deciding whether and to what extent to make credit available, offer other financial services, or engage in specific activities such as trading securities or managing their client's investment portfolios.

When banks lack "fair warning" that capital requirements will rise, however, they retreat into capital-conservation mode. *Azar v. Allina Health Servs.*, 587 U.S. 566, 582 (2019). This means they reallocate capital to less capital-intensive activities or otherwise pull back on capital expenditures. With less capital available, banks reprice their loans or exit business lines altogether, reducing the availability and affordability of credit and other financial services to businesses and households. Limitations on capital distributions also reduce the ability of banks to provide market-making services, which support the liquidity and efficiency of capital markets.

The Board's limits on capital distributions have been particularly detrimental to small business growth. Small businesses rely on bank lending to facilitate startup costs, expansion into new markets, and cash flow management during periods of low revenue. When the Board requires banks to hold too much capital, small businesses suffer. On top of that, stress tests impose "dramatically higher capital requirements" on small business loans in particular. Francisco Covas, The Clearing House, Staff Working Paper 2017-2: *Capital Requirements in Supervisory Stress Tests and Their Adverse Impact on Small Business Lending* 2 (Aug. 10, 2017), https://perma.cc/5YYA-97KA; *see also* AR-2492 n.4, PageID#2614 (The Clearing House, *Comment Letter on the Stress Testing Framework: Increased Transparency Proposal Package* 3 n.4 (January 22, 2018)) (similar). Put differently, the Board is effectively penalizing large banks for lending to small businesses, which may help to explain why small business applicants have struggled to access financing and why small business creation has plummeted over the past decade. *See* U.S. Chamber of Commerce, Center for Capital Markets Competitiveness, *Comment Letter on the Stress Testing Framework: Increased Transparency Proposal Package* 3 (Jan. 22, 2018), https://perma.cc/4HZY-8ZPK. At the very least, Board decisions that threaten the vitality of American businesses should not be made by those behind closed doors and with closed ears.

10

**II.     THE CURRENT STRESS-TESTING PROCESS VIOLATES THE APA.**

In all events, the APA mandates transparency, public participation, and reasoned decisionmaking when an agency proposes rules that bind private parties. "The baseline assumption for agency action that will have the force and effect of law" is that it must "run through a light-shedding process." *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1142, 1144 (6th Cir. 2022). Yet the current stress-testing framework leaves banks in the dark about their regulatory obligations. In fact, the Board's actions violate the APA in at least three respects.

*First*, the Board unlawfully neglected the APA's notice-and-comment procedures before developing its annual stress tests. 5 U.S.C. § 553. When an agency issues a rule that has "the force and effect of law," it "must publish a notice about the proposed rule, allow the public to comment on the rule, and, after considering the comments, make appropriate changes and include in the final rule a 'concise general statement of' its contents." *Mann*, 27 F.4th at 1142-43. This framework benefits the governed and government alike. It makes regulated parties aware of potential legal changes and offers them a chance to express their views. *Allina Health Servs.*, 587 U.S. at 582. And it gives the agency an opportunity to correct mistakes, carefully consider all relevant factors, and arrive at a more informed decision. *Id.*

The Board nevertheless refused to follow the APA's notice-and-comment process when it developed its annual stress tests. And it did so even though these rules have the "force and effect of law," as they "impose new rights or duties and change the legal status of regulated parties." *Mann*, 27 F.4th at 1143. Specifically, the stress tests alter the capital requirements that banks must abide by on a year-to-year basis. Those requirements do not appear in the U.S. Code. So banks have no duty to adjust their capital levels to meet the levels required by stress test outputs absent action by the Board. Once the Board conducted its stress tests, the status quo changed. Banks must now invest "significant time and expense" to ensure they hold enough capital to meet the Board's

11

yearly targets. *CIC Servs., LLC v. IRS*, 593 U.S. 209, 220 (2021); *see also Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 948 (D.C. Cir. 1987) (agency statements establishing "action levels" that set precise amounts of permissible containments in food qualify as binding rules). And those capital requirements are by no means optional: If a bank does not abide by them, it can face a number of adverse regulatory consequences, including "penalties"—"a leading indicator" of a rule with the force and effect of law. *Mann*, 27 F.4th at 1143; *see* Federal Reserve System, *Supervisory Policy and Guidance Topics: Enforcement*, https://perma.cc/3CJY-KG7S.

Moreover, rather than just clarify pre-existing duties that Congress specified, the stress tests carry out "an express and binding delegation of rulemaking power." *Mann*, 27 F.4th at 1143. Congress instructed the Board to "conduct annual analyses" to assess whether bank holding companies "have the capital … necessary to absorb losses as a result of adverse economic conditions." 12 U.S.C. § 5365(i)(1)(A). Pursuant to that delegation, the Board coordinates with financial regulatory agencies to "establish methodologies for the conduct of stress tests" including the "sets of conditions" for the tests. *Id.* § 5365(i)(2)(C). Underscoring the tests' binding nature, the Board may "require" bank holding companies to submit to the tests and update their capital plans based on the results. *Id.* § 5365(i)(1)(B)(ii), (iv). The stress tests, in these respects, have "the stripes and colors" of a rule with the force and effect of law. *Mann*, 27 F.4th at 1143.

*Second*, the Board concealed its standards and criteria for setting capital levels, thereby violating the APA's publication requirement and denying banks the fair notice demanded by the Due Process Clause. Agencies must publish in the Federal Register "substantive rules of general applicability," "statements of general policy or interpretations of general applicability formulated and adopted by the agency," and "each amendment, revision, or repeal of the foregoing." 5 U.S.C. § 552(a)(1)(D), (E). Such rules cannot have legal effect until publication. *Id.* § 552(a); *see id.*

12

§ 553(d) (requiring publication of substantive rule "not less than 30 days before its effective date"). Unlike rules governing notice and comment and delayed effective dates, *id.* § 553(a), (b)(A)-(B), (d)(1)-(3), the publication requirement comes with no exceptions, *id.* § 552(a)(1)(D), (E).

The Board nevertheless refuses to publish its models in the Federal Register or anywhere else. And it makes revisions without notifying the banks. The government cannot conceal a party's legal obligations in this manner. The models are substantive rules of general applicability, as they determine the legal obligations of banks and apply to all large bank holding companies subject to the stress test. The Board's hidden criteria therefore violate the APA's publication requirement and contradict the core due-process principle that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). In the absence of publication, the Board cannot enforce the capital requirements gleaned from its models. *See* 5 U.S.C. § 552(a).

*Third*, the Board acted arbitrarily when it failed to give a reasoned response to stakeholders' concerns. *See id.* § 706(2)(A). An agency action flunks the APA when it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency thus "cannot simply ignore 'an important aspect of the problem'" before it. *Ohio v. EPA*, 603 U.S. 279, 293 (2024). Yet the Board never provided a reasoned response to the concerns of SIFMA's members—specifically, their suggestion to publish the models and scenarios for notice and comment. Instead, it just asserted that its "methodology for conducting the supervisory stress test was not part of the proposal." 85 Fed. Reg. 15,576, 15,589 (Mar. 18, 2020). But an agency cannot meet its burden under the APA merely by acknowledging a stakeholder's concern; "awareness is not itself an explanation." *Ohio*, 603 U.S. at 295. Otherwise, an agency could give no basis for the choice it made, ignore the problem entirely, and insulate its decision from meaningful oversight.

13

To be sure, the Board at times has suggested that if it made certain information about the models publicly available, banks might game the stress tests without altering their behavior, leading to inaccurate results. *See, e.g.*, 84 Fed. Reg. 6,784, 6,785 (Feb. 28, 2019). But that justification falls short for at least two reasons. For one, the banks have tried to cooperate with the Board to design realistic stress tests, as they agree that such tests enhance market safety and soundness. The Board has landed on imprecise models precisely because it has refused the banks' input. For another, the analogy to gaming a "test" is inappropriate. The Board's models create a target for banks' capital levels. If the Board wants a speed limit of 55 miles per hour, it should post signs, not hand out tickets after failing to mark the road. That is to say, if the Board wants banks to meet specific capital levels, it should disclose the models and the scenarios that generate those levels. The government cannot hide the law from the public out of fear they will obey it. *See Fox*, 567 U.S. at 253.

\*     \*     \*

The stress-testing process could have been a model of informed decisionmaking. Sophisticated stakeholders like SIFMA were ready, willing, and able to lend their expertise to develop stress tests that accurately forecast risk. But the Board refused to listen. Rather than engaging with the public, the Board developed stress tests in secret and then sprung higher capital requirements on large banks. It should come as no surprise that this approach produced arbitrary results that overstate risk, to the harm of families and businesses across the country. The APA demands better, and this Court should be the first to say so.

14

## CONCLUSION

This Court should grant summary judgment in favor of Plaintiffs.

March 28, 2025                     Respectfully submitted,

/s/ *Thomas Conerty*

Brinton Lucas*
Nathaniel Sutton*
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
blucas@jonesday.com
nsutton@jonesday.com

Thomas Conerty
Bar No. 101619
JONES DAY
325 John H. McConnell Boulevard
Suite 600
Columbus, OH 43215
Phone: (614) 469-3939
Fax: (614) 461-4198
tconerty@jonesday.com

*Counsel for Amicus Curiae*

* Application for *pro hac vice* pending

15

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to all counsel of record.

*/s/ Thomas Conerty*
Thomas Conerty

*Counsel for Amicus Curiae*
