**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

BANK POLICY INSTITUTE, OHIO
CHAMBER OF COMMERCE, OHIO
BANKERS LEAGUE, AMERICAN
BANKERS ASSOCIATION and CHAMBER
OF COMMERCE OF THE UNITED STATES
OF AMERICA,

                Plaintiffs,

      v.

BOARD OF GOVERNORS OF THE
FEDERAL RESERVE SYSTEM,

                Defendant.

Case No. 2:24-cv-04300
District Judge Algenon L. Marbley
Magistrate Judge Chelsey M. Vascura

---

**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

      Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 7.2 of the Local

Civil Rules of the United States District Court for the Southern District of Ohio, Defendant

Board of Governors of the Federal Reserve System ("Board") hereby moves this Court for

summary judgment in the above-captioned matter. The grounds for this Motion are set forth in

the accompanying Memorandum of Law in Support of Defendant's Cross-Motion for Summary

Judgment and Opposition to Plaintiffs' Motion for Summary Judgment.

Dated: April 29, 2025

Respectfully submitted,

*/s/ Joshua P. Chadwick*
Joshua P. Chadwick
Assistant General Counsel, Trial Attorney
Nicholas Jabbour
Monika Moore
Senior Counsels
Board of Governors of the Federal Reserve System

20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
joshua.p.chadwick@frb.gov
(202) 263-4835

*Attorneys for the Board of Governors of the Federal
Reserve System*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| BANK POLICY INSTITUTE, OHIO CHAMBER OF COMMERCE, OHIO BANKERS LEAGUE, AMERICAN BANKERS ASSOCIATION and CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,<br><br>          Plaintiffs,<br><br>     v.<br><br>BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,<br><br>          Defendant. | Case No. 2:24-cv-04300<br>District Judge Algenon L. Marbley<br>Magistrate Judge Chelsey M. Vascura |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................. v

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 5

    A.    Supervisory Stress Tests ..................................................................... 7

    B.    The Stress Capital Buffer Requirement ........................................... 9

    C.    Reconsideration Requests From Firms Regarding SCB Requirements ............... 10

    D.    The Board's Actions to Simplify the Stress Testing Framework and to Promote Transparency ....................................................................... 13

        1.    Enhanced Model Disclosures .................................................... 13

        2.    Scenario Policy Statement ........................................................ 15

        3.    Stress Testing Policy Statement ............................................... 16

        4.    2020 Regulatory Capital, Capital Plan, and Stress Test Rules ............... 17

        5.    2024 and 2025 Board Actions .................................................. 18

ARGUMENT ............................................................................................................... 20

I.    The Imposition of a Firm-Specific Stress Capital Buffer Requirement and the Models and Scenarios Used in Determining That Requirement Are Part of an APA Adjudication Committed to Agency Discretion and Are Not Legislative Rules ................... 20

    A.    Setting a Firm's SCB Requirement Is a Case-Specific Determination ............... 21

        1.    Firm-Specific Data Drives Stress Test Outputs ......................... 22

        2.    The Board Exercises Discretion When Applying Scenarios and Adjustments to Model Inputs and Outputs in Conducting Each Firm's Individual Stress Test ....................................................... 22

        3.    The Board Exercises Discretion in Determining Which Stress Test to Use When Setting a Firm's SCB Requirement ......................... 25

i

4.     Determining a Firm's SCB Requirement Is a Substantially Retrospective Exercise ................................................................................. 26

B.     The ILSA and HOLA Statutes Commit Adjudication Decisions Related to SCB Requirements to the Board's Discretion ......................................... 27

1.     ILSA Grants the Board Discretion to Impose Minimum Capital Requirements ..................................................................... 27

2.     HOLA Grants the Board Discretion to Impose Minimum Capital Requirements on SLHCs ....................................................... 29

C.     The Models and Scenarios Are Not Legislative Rules That Require Notice and Comment Rulemaking .................................................................. 30

The Board has broad discretion to determine whether to take action by rule or adjudication. *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947). The imposition of a firm-specific stress capital buffer requirement is the result of an APA adjudication that is committed to agency discretion by law, 5 U.S.C. § 701(a), and the models and scenarios used as tools in that process are not legislative rules. The process of determining an individual firm's SCB requirement incorporates individualized determinations at multiple stages of the process, and setting a firm's SCB requirement is a substantially retrospective exercise. Congress granted the Board explicit authority and discretion under ILSA to conduct adjudications to set firm-specific capital requirements, 12 U.S.C. §§ 3907(a)(2), 3909(a)(2), 5311, and courts have repeatedly held that these decisions are committed to agency discretion by law. *Frontier State Bank Oklahoma City v. FDIC*, 702 F.3d 588, 597 (10th Cir. 2012); *FDIC v. Coushatta*, 930 F.2d 1122, 1129 (5th Cir. 1991); *Transohio Sav. Bank v. Director, Office of Thrift Supervision*, 1991 WL 201178, at *5 (D.D.C. Aug. 1, 1991). Section 10 of HOLA also provides the Board with authority to issue orders for savings and loan holding companies, including "orders relating to capital requirements" "as the Board deems necessary or appropriate," 12 U.S.C. § 1467a(g)(1), which are likewise committed to the agency's discretion. *See Webster v. Doe*, 486 U.S. 592, 600-01 (1988); *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *United Liberty Life Ins. Co. v. Ryan*, 985 F.2d 1320, 1327 (6th Cir. 1993).

II.     Neither the FOIA Amendments to the APA Nor the Due Process Clause Require the Board to Publish the Stress Test Models ............................................................ 32

A.     The FOIA Amendments to The APA Do Not Require the Board to Publish the Stress Test Models ..................................................................... 32

1.     FOIA Exemption 5 Applies ....................................................... 33

2.     FOIA Exemption 7 Applies ....................................................... 35

B.       Nondisclosure of the Stress Test Models Does Not Violate the Due Process
         Clause ...................................................................................................... 37

The FOIA Amendments to the APA and the Due Process Clause do not require
publication of the stress testing models. At a minimum, the models are exempt from
disclosure pursuant to FOIA exemptions 5 and 7. 5 U.S.C. § 552(b)(5), (7); *Fed. Open
Mkt. Comm. v. Merrill*, 443 U.S. 340, 360 n.23 (1979). Exemption 5 encompasses
information subject to a litigation privilege or that would be entitled to protection under a
protective order. *Fed. Open Mkt. Comm.*, 443 U.S. at 362 n.24. The models are analogous
to other testing or assessment materials that courts have protected from disclosure. *See,
e.g.*, *EEOC v. Kronos Inc.*, 694 F.3d 351, 367 (3d Cir. 2012), as amended (Nov. 15, 2012).
Exemption 7 also applies because releasing the models could disclose enforcement
techniques and procedures and may allow firms to engage in strategic gaming of the tests.
*Cf., e.g.*, *Jones v. FBI*, 41 F.3d 238, 249 (6th Cir. 1994). Furthermore, Plaintiffs have
failed to show that not disclosing the models violates the Due Process Clause on
vagueness grounds. Apart from the unavailability of a facial challenge on this basis in the
context of economic regulation, regulated entities have sufficient notice of what conduct
would cause them to face limitations on their capital distributions and discretionary bonus
payments due to the SCB regulatory requirement and due process does not require the
type of "mathematical certainty" that Plaintiffs demand. *Vill. of Hoffman Ests. v. Flipside,
Hoffman Ests., Inc.*, 455 U.S. 489, 494–95 (1982); *Hill v. Colorado*, 530 U.S. 703, 733
(2000).

III.   The Board's 2019 Disclosure and Policy Statements and 2020 Rule Are Not Arbitrary and
       Capricious ................................................................................................. 40

       A.     The Board Voluntarily Sought Comment on the 2019 Disclosure and Policy
              Statements and Adequately Responded .............................................. 41

       B.     The Board Adequately Addressed Comments Received Regarding the
              2020 Rule ........................................................................................ 45

       C.     Any Relief Relating to the 2019 Disclosure and Policy Statements or the 2020
              Rule Should Be Limited to Remand Without Vacatur .......................... 47

The Board's 2019 Disclosure and Policy Statements were neither arbitrarily nor
capriciously adopted. While the Board was not required to seek comment on these agency
actions, the Board voluntarily sought comment and adequately considered these
comments. 5 U.S.C. § 553(b)(4)(A). While questions about the transparency of the stress
test models were not a part of the 2020 Proposed Rule, the Board also adequately
responded to commenter's views on this topic when issuing the rule. *See Motor Vehicle
Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983); *Public
Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993). To the extent this Court
concludes that any aspect of the Board's response to these comments was inadequate, the
correct remedy is to remand without vacatur. *Sierra Club v. EPA*, 60 F.4th 1008, 1022
(6th Cir. 2023).

CONCLUSION........................................................................................................................ 49

# TABLE OF AUTHORITIES

Page

**Cases**

*Abraham & Rose, P.L.C. v. United States*,
  138 F.3d 1075 (6th Cir. 1998) .......................................................................... 35

*ACLU of Michigan v. FBI*,
  734 F.3d 460 (6th Cir. 2013) ............................................................................ 37

*American Great Lakes Ports Association v. Zukunft*,
  296 F. Supp. 3d 27 (D.D.C. 2017), aff'd, 962 F.3d 510 (D.C. Cir. 2020) ........................ 45

*Association of Cleveland Fire Fighters v. City of Cleveland, Ohio*,
  502 F.3d 545 (6th Cir. 2007) ............................................................................ 40

*Belle Maer Harbor v. Charter Township of Harrison*,
  170 F.3d 553 (6th Cir. 1999) ............................................................................ 38

*Carlson v. Postal Regulatory Commission*,
  938 F.3d 337 (D.C. Cir. 2019) ..................................................................... 44, 45

*Center For Auto Safety v. National Highway Traffic Safety Administration*,
  452 F.3d 798 (D.C. Cir. 2006) .......................................................................... 42

*Chamber of Commerce of U.S. v. SEC*,
  85 F.4th 760 (5th Cir. 2023) ............................................................................ 44

*Clarian Health West, LLC v. Hargan*,
  878 F.3d 346 (D.C. Cir. 2017) .......................................................................... 42

*Conference Group, LLC v. FCC*,
  720 F.3d 957 (D.C. Cir. 2013) ..................................................................... 21, 26

*Detroit Edison Co. v. NLRB*,
  440 U.S. 301 (1979) ...................................................................................... 34

*EEOC v. Aon Consulting, Inc.*,
  149 F. Supp. 2d 601 (S.D. Ind. 2001) ................................................................. 34

*EEOC v. Kronos Inc.*,
  694 F.3d 351 (3d Cir. 2012) ............................................................................. 34

v

*FDIC v. Coushatta,*
 930 F.2d 1122 (5th Cir. 1991) ........................................................................ 28

*Federal Open Market Committee v. Merrill,*
 443 U.S. 340 (1979) ............................................................................... 33, 35

*Florida Power & Light Co. v. Lorion,*
 470 U.S. 729 (1985) ...................................................................................... 48

*Frontier State Bank Oklahoma City v. FDIC,*
 702 F.3d 588 (10th Cir. 2012) ....................................................................... 28

*Guardian Federal Savings & Loan Association v. Federal Savings & Loan Insurance Corp.,*
 589 F.2d 658 (D.C. Cir. 1978) ................................................................. 41, 42

*Heartland Regional Medical Center v. Sebelius,*
 566 F.3d 193 (D.C. Cir. 2009) ....................................................................... 48

*Heckler v. Chaney,*
 470 U.S. 821 (1985) ...................................................................................... 29

*Hill v. Colorado,*
 530 U.S. 703 (2000) ...................................................................................... 39

*Humane Society of the U.S. v. Animal & Plant Health Inspection Service,*
 386 F. Supp. 3d 34 (D.D.C. 2019) ................................................................. 37

*Jones v. FBI,*
 41 F.3d 238 (6th Cir. 1994) ........................................................................... 37

*Jordan v. U.S. Dep't of Just.,*
 668 F.3d 1188 (10th Cir. 2011) ..................................................................... 36

*Knight First Amendment Institute at Columbia University v. U.S. Citizenship & Immigration Services,* 30 F.4th 318 (2d Cir. 2022) ................................................................. 36

*McLouth Steel Products Corp. v. Thomas,*
 838 F.2d 1317 (D.C. Cir. 1988) ..................................................................... 31

*Milner v. Dep't of Navy,*
 562 U.S. 562 (2011) ...................................................................................... 36

*Minutemen Health, Inc. v. HHS,*
 291 F. Supp. 3d 174 (D. Mass. Jan. 30, 2018) ............................................... 46

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010) ................................................................. 47, 48

*Motor Vehicle Manufacturers Association of U.S., Inc. v. State Farm Mutual Auto Insurance Co.,*
  463 U.S. 29 (1983) ......................................................................... 46

*Muff v. Wells Fargo Bank N.A.,*
  No. 21-CV-4003-CJW, 2022 WL 601051 (N.D. Iowa Jan. 28, 2022) ...................... 34, 35

*N.Y. State Commission on Cable Television v. FCC,*
  749 F.2d 804 (1984) ......................................................................... 21

*NACS v. Board of Governors of the Federal Reserve System,*
  746 F.3d 474 (D.C. Cir. 2014) ............................................................... 48

*National Mining Association v. Mine Safety & Health Administration,*
  116 F.3d 520 (D.C. Cir. 1997) ............................................................... 47

*Neustar v. FCC,*
  857 F.3d 886 (D.C. Cir. 2017) ............................................................... 26

*NLRB v. Bell Aerospace Co. Division of Textron, Inc.,*
  416 U.S. 267 (1974) ......................................................................... 20

*NLRB v. Sears, Roebuck & Co.,*
  421 U.S. 132 (1977) ......................................................................... 33

*Ohio Environmental Council v. U.S. Forest Service,*
  No. 2:21-cv-4380, 2023 WL 6370383 (S.D. Ohio Aug. 3, 2023) ............................ 48

*Perez v. Mortgage Bankers Association,*
  575 U.S. 92 (2015) ......................................................................... 41

*Public Citizen, Inc. v. FAA,*
  988 F.2d 186 (1993) ......................................................................... 46

*Public Employees for Environmental Responsibility v. International Boundary & Water Commission, U.S.-Mexico,*
  740 F.3d 195 (D.C. Cir. 2014) ............................................................... 36

*Safari Club International v. Zinke,*
  878 F.3d 316 (D.C. Cir. 2017) ............................................................... 20

*SAS Institute, Inc. v. World Programming Ltd.,*
  874 F.3d 370 (4th Cir. 2017) ............................................................... 48

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) ............................................................................... 20, 31

*Sierra Club v. EPA*,
    60 F.4th 1008 (6th Cir. 2023) ........................................................................ 48

*Small v. IRS*,
    820 F. Supp. 163 (D.N.J. 1992) ...................................................................... 37

*Tennessee Hospital Association v. Azar*,
    908 F.3d 1029 (6th Cir. 2018) ........................................................................ 32

*The Equal Rights Center v. Lion Gables Residential Trust*,
    No. CIVA DKC 07-2358, 2010 WL 2483613 (D. Md. June 15, 2010) .......................... 35

*Transohio Savings Bank v. Director, Office of Thrift Supervision*,
    Civ. A. No. 90–1678, 1991 WL 201178 (D.D.C. Aug. 1, 1991) ............................... 28, 29

*United Liberty Life Insurance Co. v. Ryan*,
    985 F.2d 1320 (6th Cir. 1993) ..................................................................... 29, 30

*United States v. Midwest Fireworks Manufacturing Co.*,
    248 F.3d 563 (6th Cir. 2001) ...................................................................... 39, 40

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*,
    435 U.S. 519 (1978) ...................................................................................... 42

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) ................................................................................. 38, 39

*Wayne v. Officer Ralph Kirk #21*,
    No. 13 C 8540, 2016 WL 492338 (N.D. Ill. Feb. 9, 2016) ...................................... 34

*Webster v. Doe*,
    486 U.S. 592 (1988) ...................................................................................... 29

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................................ 48

**Statutes**

5 U.S.C. § 551(4) ............................................................................................ 20

5 U.S.C. § 551(6)-(7) ...................................................................................... 20

5 U.S.C. § 552 ............................................................................................... 32

5 U.S.C. § 552(a) ............................................................................................. 33

5 U.S.C. § 552(a)(1)(D) .................................................................................... 33

5 U.S.C. § 552(a)(1)(E) .................................................................................... 33

5 U.S.C. § 552(b) .............................................................................................. 33

5 U.S.C. § 552(b)(1)-(9) ................................................................................... 33

5 U.S.C. § 552(b)(5) ......................................................................................... 33

5 U.S.C. § 552(b)(7) ......................................................................................... 35

5 U.S.C. § 552(b)(7)(A) .................................................................................... 35

5 U.S.C. § 552(b)(7)(E) .................................................................................... 35

5 U.S.C. § 553(b)(4)(A) .................................................................................... 41

5 U.S.C. § 701(a)(1)-(2) ................................................................................... 27

5 U.S.C. § 702 .................................................................................................. 27

12 U.S.C. § 1467a(g)(1) ................................................................... 21, 27, 29, 30

12 U.S.C. § 1818 ............................................................................................... 28

12 U.S.C. § 1818(b)(1) ..................................................................................... 36

12 U.S.C. § 1818(b)(3) ..................................................................................... 36

12 U.S.C. § 1818(i) ........................................................................................... 28

12 U.S.C. § 3907 ................................................................................... 21, 27, 31

12 U.S.C. § 3907(a)(2) ...................................................................................... 27

12 U.S.C. § 3907(b)(1) ................................................................................ 28, 36

12 U.S.C. § 3907(b)(2)(A) ................................................................................ 27

12 U.S.C. § 3907(b)(2)(B)(ii) ...................................................................... 27, 28

12 U.S.C. § 3909(a)(2) ...................................................................................... 27

12 U.S.C. § 5311 ................................................................................................................ 27

12 U.S.C. § 5365 (note) ........................................................................................... 6, 7, 10

12 U.S.C. § 5365(b)(2) ........................................................................................................ 6

12 U.S.C. § 5365(i) .............................................................................................................. 6

12 U.S.C. § 5365(i)(1) ....................................................................................................... 10

12 U.S.C. § 5365(i)(1)(A) ................................................................................................ 1, 7

12 U.S.C. § 5365(i)(2) ....................................................................................................... 14

Economic Growth, Regulatory Relief, and Consumer Protection Act, Pub. L. No. 115-174, 132
    Stat. 1296, tit. IV, § 401(e) (codified as amended at 12 U.S.C. § 5365 (note)(2018)) ....... 6

**Regulations**

12 C.F.R. § 217.11(c) ....................................................................................................... 10

12 C.F.R. § 225.8 ................................................................................................................ 9

12 C.F.R. § 225.8(f) .......................................................................................................... 10

12 C.F.R. § 225.8(f)(1) ..................................................................................................... 10

12 C.F.R. § 225.8(f)(2) ................................................................................................. 10, 22

12 C.F.R. § 225.8(f)(2)(i) .................................................................................................. 25

12 C.F.R. § 225.8(f)(2)(ii) ................................................................................................. 39

12 C.F.R. § 225.8(f)(3) ...................................................................................................... 10

12 C.F.R. § 225.8(g)(5) ..................................................................................................... 36

12 C.F.R. § 225.8(h)-(i) ..................................................................................................... 11

12 C.F.R. § 225.8(h)(2)(ii) ................................................................................................ 12

12 C.F.R. § 225.8(h)(4) ................................................................................................. 12, 26

12 C.F.R. § 225.8(h)(4)(i) ............................................................................................... 3, 12

12 C.F.R. § 225.8(i) ........................................................................................................... 11

12 C.F.R. § 225.8(i)(3)(i) ................................................................................ 11

12 C.F.R. § 225.8(i)(4)(ii) ............................................................................... 11

12 C.F.R. § 238.132(b) ................................................................................... 23

12 C.F.R. § 238.132(c)(1) ............................................................................... 10

12 C.F.R. § 238.133(b) ................................................................................... 24

12 C.F.R. § 238.170 ........................................................................................... 9

12 C.F.R. § 238.170(f)(1) ............................................................................... 10

12 C.F.R. § 238.170(f)(2) ......................................................................... 10, 22

12 C.F.R. § 238.170(f)(2)(i) ............................................................................ 25

12 C.F.R. § 238.170(f)(3) ............................................................................... 10

12 C.F.R. § 238.170(h)-(i) .............................................................................. 11

12 C.F.R. § 238.170(h)(2)(ii) .......................................................................... 12

12 C.F.R. § 238.170(h)(4) ......................................................................... 12, 26

12 C.F.R. § 238.170(h)(4)(1) .......................................................................... 12

12 C.F.R. § 238.170(i) .................................................................................... 11

12 C.F.R. § 238.170(i)(3)(i) ............................................................................ 11

12 C.F.R. § 238.170(i)(4)(ii) ........................................................................... 11

12 C.F.R. § 238 Subpart O ................................................................................ 7

12 C.F.R. § 238 Subpart P .............................................................................. 14

12 C.F.R. § 252.44(b) ..................................................................................... 23

12 C.F.R. § 252.44(d)(1) ................................................................................ 10

12 C.F.R. § 252.45(b) ..................................................................................... 24

12 C.F.R. § 252 Subpart E ................................................................................ 7

12 C.F.R. § 252 Subpart F ............................................................................................. 14

12 C.F.R. Part 252, Appendix A ............................................................................. 10, 17

12 C.F.R. Part 252, Appendix A, Sections 2 & 3 ......................................................... 7

12 C.F.R. Part 252, Appendix B .................................................................................. 10

12 C.F.R. Part 252, Appendix B, Section 2.3 ............................................................... 8

**Other Authorities**

72 Fed. Reg. 3,432 (Jan. 25, 2007) ............................................................................. 41

90 Fed. Reg. 16,843 (Apr. 22, 2025) .......................................................................... 19

Baudino et al., *Stress-Testing Banks – A Comparative Analysis*, Bank for International
    Settlements (Nov. 2018) https://www.bis.org/fsi/publ/insights12.pdf ............................ 14

Board of Governors of the Federal Reserve System, Dodd-Frank Stress Test 2020: Supervisory
    Stress Test Results (June 2020) https://www.federalreserve.gov/publications/files/2020-
    dfast-results-20200625.pdf .................................................................................. 24

Board of Governors of the Federal Reserve System, 2023 Stress Test Methodology (June 2023)
    https://www.federalreserve.gov/publications/files/2023-june-supervisory-stress-test-
    methodology.pdf .................................................................................................... 3

Board of Governors of the Federal Reserve System, Bank Holding Company Supervision
    Manual § 1050.0.2.2 (2024) ................................................................................. 36

Board of Governors of the Federal Reserve System, Instructions for the Capital Assessments and
    Stress Testing Reports (Reporting Form FR Y-14A), OMB No. 7100-0341 (Feb. 29,
    2024) https://www.federalreserve.gov/reportforms/forms/FR_Y-14Q20210331_i.pdf ... 26

Board of Governors of the Federal Reserve System, Press Release (Dec. 23, 2024)
    https://www.federalreserve.gov/newsevents/pressreleases/bcreg20241223a.htm ............ 18

Board of Governors of the Federal Reserve System, Press Release (Apr. 17, 2025)
    https://www.federalreserve.gov/newsevents/pressreleases/bcreg20250417a.htm ............ 19

Donald Kohn and Nellie Liang, *Understanding the Effects of the*
    *U.S. Stress Tests* (July 11, 2019 https://www.brookings.edu/articles/understanding-the-
    effects-of-the-u-s-stress-tests ................................................................................. 7

Federal Reserve Bank of Boston, 2024 Federal Reserve Stress Testing Research Conference (Oct. 10-11, 2024) https://www.bostonfed.org/news-and-events/events/federal-reserve-stress-testing-research-conference/2024.aspx....................................................................... 9

Federal Reserve System, SMV Group, Letter to The Goldman Sachs Group (Aug. 23, 2024) https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20240828a1.pdf..................................................................................... 11, 12, 25

H.R. Rep. No. 175, 98th Cong., 1st Sess. 29 (1983) .................................................................. 31

Itay Goldstein & Yaron Leitner, *Stress Tests Disclosure: Theory, Practice, and New Perspectives*, Handbook of Financial Stress Testing (J. Farmer, et al. eds., 2022)................................. 14

Keeyoung Rhee & Keshav Dogra, *Stress Tests and Model Monoculture*, 152 J. Fin. Econ. (2024)...................................................................................................... 14

U.S. Dept. of Justice, Attorney General's Manual on the Administrative Procedure Act (1947)  42

## INTRODUCTION

This case involves the annual supervisory stress tests conducted by the Board of Governors of the Federal Reserve System ("the Board") to help ensure that each large banking firm subject to the tests has sufficient capital on hand to absorb potential losses during a severe economic downturn. The Board's supervisory stress tests were developed in response to the 2008 financial crisis, during which the collapse of several large firms resulted in financial instability and a severe economic decline. The crisis eroded public confidence in the adequacy of capital in the banking system and had material adverse effects on U.S. households and businesses for years. The first stress tests—originally conducted in 2009—were a supervisory exercise and were critical to restoring public confidence in the banking system. The tests were so successful that Congress ultimately directed the Board to conduct regular stress tests for large bank holding companies when it enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"). 12 U.S.C. § 5365(i)(1)(A). The stress tests remain a key tool to help ensure that each large banking institution subject to the test is adequately capitalized, as determined by its unique characteristics, so that it can serve as a source of strength, rather than vulnerability, in an economic downturn.

The Board's stress testing program has evolved over time and currently exists within a larger adjudicatory framework established by legislative rule in 2020. Under this framework, the Board uses the supervisory stress tests as a tool in determining the individual stress capital buffer ("SCB") requirement that applies to each large banking firm subject to the Board's Capital Plan Rule. The SCB requirement is intended to represent an amount of capital that a firm must maintain to absorb large, unexpected losses in the event of adverse economic scenarios.

1

Within this framework, the Board uses its supervisory stress tests to estimate each banking firm's losses, revenues, and capital needs under hypothetical macroeconomic scenarios. The scenarios are generated by the Board and are announced each year at the beginning of the stress test cycle. The Board then uses a set of models and a variety of input data (including firm-specific financial data and firm-specific information about planned capital distributions ("Capital Assessment Stress Testing Data")) to generate estimates of how firms would perform in each of a set of plausible, adverse economic scenarios, *i.e.*, the stress test results. The stress test results are an input into the Board's process for determining the appropriate SCB requirement for each institution. This framework allows the Board to calibrate each firm's SCB requirement to the firm's idiosyncratic risk, while also assuring an even-handed approach across institutions subject to the stress tests.

The Board has attempted to strike a balance between providing transparency regarding the stress test models and maximizing the stress tests' effectiveness. While firms' individual SCB requirements result from adjudications which Congress has committed to the Board's discretion, the Board has made extensive disclosures regarding its methodology and guiding principles for administering the stress tests, in the form of the annual Stress Test Methodology Disclosure ("Methodology Disclosure") as well as two 2019 policy statements and one disclosure related to the stress testing framework (collectively "2019 Disclosure and Policy Statements").[1]

---

[1] *See* AR-2358-59, PageID 2480-81 (2024 Supervisory Stress Test Methodology); AR-31-34, PageID 175-78 (84 Fed. Reg. 6,784-87 (Feb. 28, 2019)) (Enhanced Disclosure of the Models Used in the Federal Reserve's Supervisory Stress Test) ("Enhanced Models Disclosure"); AR-43-56, PageID 187-200 (84 Fed. Reg. 6,651-64 (Feb. 28, 2019)) (Amendments to Policy Statement on the Scenario Design Framework for Stress Testing) ("Scenario Policy Statement"); AR-35-42, PageID 179-86 (84 Fed. Reg. 6,664-71 (Feb. 28, 2019)) (Stress Testing Policy Statement).

Under this framework, the Board provides each firm subject to the stress test with a notice of its preliminary SCB requirement each year, explaining its stress test results and how those results factored into the SCB requirement. Firms receive the annual Methodology Disclosure at least by the time that they receive their stress test results and often earlier.[2] Once a firm has received notice of its preliminary SCB requirement, it has the opportunity to challenge the Board's determination in light of its unique balance sheet, business risks, and planned capital distributions. No firm's SCB requirement is finalized without this opportunity to challenge the Board's determination. The Board provides each firm with notice of its final SCB requirement by August 31 each year. *See* 12 C.F.R. § 225.8(h)(4)(i).

In connection with its efforts to promote transparency and engagement around the stress tests, the Board voluntarily sought comment on the 2019 Disclosure and Policy Statements. Through this process, the Board publicly explained the downsides of full disclosure of the scenarios and models. The Board noted, for example, that firms may change their businesses or otherwise manipulate firm-specific data in ways that would positively influence their stress test results but not actually change the risks that the firms face. The Board also identified the concern that firms may be incentivized to use the Board's models to conduct their own assessments—as opposed to developing their own internal testing models—which could cause firms to miss key idiosyncratic risks. In 2020, the Board adopted a final rule that established the framework to link the results of the supervisory stress tests to the determination of each firm's SCB requirement. AR-1-30, PageID 145-74 (85 Fed. Reg. 15,576-605 (Mar. 18, 2020)) ("2020 Rule"). In

---

[2] *See, e.g.*, AR-2358-59, PageID 2480-2581 (2024 Supervisory Stress Test Methodology); 2023 Stress Test Methodology (June 2023), *available at* https://www.federalreserve.gov/publications/files/2023-june-supervisory-stress-test-methodology.pdf.

responding to comments regarding this proposed rule, the Board once again noted the concerns motivating the Board to limit disclosure of the details of the models.

Plaintiffs Bank Policy Institute, Ohio Chamber of Commerce, Ohio Bankers League, American Bankers Association, and Chamber of Commerce of the United States of America ("Plaintiffs") now challenge the Board's stress testing framework. Plaintiffs first claim that the stress test scenarios and models are legislative rules that are subject to the notice and comment requirements of the Administrative Procedure Act ("APA"). Second, Plaintiffs assert that the Board's decision not to fully disclose the models violates the Freedom of Information Act's ("FOIA") amendments to the APA and the Due Process Clause. Third, Plaintiffs allege that the Board's 2019 Disclosure and Policy Statements and the 2020 Rule were arbitrary and capricious because the Board failed to explain its decisions to not subject the scenarios and models to notice and comment.

As explained in detail below, Plaintiffs' arguments fail on all counts. First, the annual imposition of a firm-specific SCB requirement is the end result of an APA adjudication for each firm. The models and scenarios are tools that the Board uses in that adjudicatory process, not legislative rules. Furthermore, the fact that the Board does not disclose the details of the stress testing models does not violate the FOIA Amendments to the APA because, at a minimum, the models are exempt from disclosure under FOIA exemptions 5 and 7. In addition, Plaintiffs cannot show a violation of the Due Process Clause. Specifically, the SCB regulations provide sufficient notice of what conduct would cause regulated institutions to face limitations on their capital distributions and discretionary bonus payments due to the SCB requirement, and the Board also discloses additional details about the models. Finally, while the Board was not required to seek comment on the 2019 Disclosure and Policy Statements, the Board adequately

4

responded to the comments received regarding these documents as well as those the Board received regarding the 2020 Rule. These agency actions complied with the requirements of the APA, and judgment should be entered in the Board's favor as a result.

## BACKGROUND

As discussed above, supervisory stress tests are one of the most effective tools banking regulators have to promote the safety and soundness of large financial institutions and financial stability. AR-942, PageID 1086 (Apr. 5, 2018 Board Staff Memo on Proposed Rule Regarding the Stress Buffer Requirements). Initially developed by the Board as a response to the financial crisis of 2008, and later codified by Congress in the Dodd-Frank Act, stress tests help to ensure that each large and complex financial institution has sufficient capital on hand that is commensurate with its unique risk profile. AR-941-42, PageID 1085-86 (*Id.*).

The 2008 financial crisis revealed that existing regulatory mechanisms, such as risk-based capital ratios, were not accurate measures of the risks that banking firms faced in severely adverse scenarios. As a result, when the financial crisis occurred, many firms did not have adequate levels of capital to cover their losses. *Id.* These problems were compounded by the fact that, during the crisis, many firms engaged in activities that exacerbated their vulnerabilities. For example, many banks continued to distribute capital to shareholders, rather than conserving loss-absorbing resources. The lack of transparency into the risk profiles of firms also led to increased uncertainty. *Id.* The public lost confidence in the banking sector, which resulted in significant detrimental impacts to households and businesses. AR-941, PageID 1085 (*Id.*). The American public suffered widespread job losses, increased poverty rates, a wave of foreclosures as homeowners defaulted on mortgages, and significant declines in median household wealth. Congress, the United States Treasury, the Board, and the Federal Deposit Insurance Corporation

were forced to intervene to avoid further economic deterioration and to restore financial stability. *Id.*

At the height of the crisis, the Board developed the initial supervisory stress test as part of the Supervisory Capital Assessment Program ("SCAP"). The SCAP used firm-specific data and quantitative models to project the capital needs of the largest bank holding companies ("BHCs") if economic and financial conditions continued to worsen. The objective of the SCAP was to restore public confidence in these large banking firms. AR-1, PageID 145 (85 Fed. Reg. 15,576 (Mar. 18, 2020)). The SCAP was so successful—both as a supervisory tool and in promoting market confidence in the stability of banking firm's balance sheets—that Congress, in the Dodd-Frank Act, required the Board to conduct annual stress test exercises as a "quantitative evaluation of the impact of stressful economic and financial market conditions on firms' capital." AR-56, PageID 200 (84 Fed. Reg. 6,664 (Feb. 28, 2019)); 12 U.S.C. §§ 5365(b)(2); 5365(i); 5365 note (the Board "shall, on a periodic basis, conduct supervisory stress tests").[3]

Stress testing and stronger risk-based capital requirements have significantly improved the resilience of the U.S. banking system. AR-2, PageID 146 (85 Fed. Reg. at 15,577). In particular, stress testing has contributed to more individualized assessments of a banking firm's risk profile compared with the use of risk-based capital ratios alone, contributing to increases in the quantity of capital at the largest, most complex banks. The common equity capital ratio of large banks more than doubled from 4.9 percent in 2009 to 12.3 percent in 2018, with total common equity capital doubling over that same period to more than $1 trillion. AR-590,

---

[3] In 2018, Congress amended provisions related to the timing of the stress tests for certain banking firms. Economic Growth, Regulatory Relief, and Consumer Protection Act, Pub. L. No. 115-174, 132 Stat. 1296, tit. IV, § 401(e) (codified as amended at 12 U.S.C. § 5365 note (2018) (Supervisory Stress Test)). In doing so, Congress reaffirmed its commitment to the Board's stress testing program.

PageID 734 (Board Staff Memo on Draft Final Rule Regarding the Stress Capital Buffer (Feb. 19, 2020)). Ensuring that banks have enough capital to weather times of crisis prevents bank failure and subsequent bailouts, protects the interest of taxpayers, and preserves access to bank credit for households and businesses during times of stress. Moreover, studies[4] have shown that the stress tests have helped to mitigate the procyclicality of capital. This was evident during recent stressful periods, such as the COVID-19 pandemic and the March 2023 banking stress, during which the largest banks continued to provide critical banking services to households and businesses.

###### A.    Supervisory Stress Tests

The Dodd-Frank Act directs the Board to conduct supervisory stress tests to evaluate whether companies "have the capital, on a total consolidated basis, necessary to absorb losses as a result of adverse economic conditions." 12 U.S.C. §§ 5365(i)(1)(A), 5365 note. The Board conducts stress tests for BHCs, certain savings and loan holding companies ("SLHCs"), and U.S. intermediate holding companies of foreign banking firms ("U.S. IHCs") that have total assets of $100 billion or more. 12 C.F.R. Part 238, Subpart O; 12 C.F.R. Part 252, Subpart E. Like the SCAP, the supervisory stress tests analyze the resilience of large banking firms by using quantitative models and firm-specific data to project losses, net revenue, and capital levels under hypothetical adverse economic scenarios.

To help ensure that the largest banking firms have sufficient capital to withstand plausible economic stress, the Board uses quantitative models to help develop new scenarios each year that are based on real-world economic data and the banking agencies' evaluation of risks and

---

[4] *See, e.g.*, Donald Kohn and Nellie Liang, *Understanding the Effects of the U.S. Stress Tests* (July 11, 2019), *available at* https://www.brookings.edu/articles/understanding-the-effects-of-the-u-s-stress-tests.

vulnerabilities in the banking sector. *See* 12 C.F.R. Part 252 App'x A, Sections 2 & 3. The Board then uses a second set of quantitative models and a variety of data (including firm-specific data) to evaluate how each banking firm is likely to perform under the hypothetical scenarios. Because each projection is based on firm-specific data, the results of the stress tests are highly tailored to the unique balance sheets and business risks of each banking firm.

Although the quantitative models used in the supervisory stress test are not disclosed in full, they are described in a detailed annual Methodology Disclosure that firms receive at least by the time they receive their preliminary SCB requirement and explanation of stress test results, if not sooner. *See, e.g.*, AR-2358-59, PageID 2480-81 (2024 Supervisory Stress Test Methodology). The Methodology Disclosure includes detailed descriptions of the supervisory stress test models. *Id.* The Board has historically modified its methodology over time to improve the process, and intentionally phases in material changes to the methodology over time to reduce volatility. *Id.*; 12 C.F.R. Part 252, App'x B, Section 2.3. These changes provide for continuous improvements in the accuracy of the supervisory stress tests and produce assessments that correlate more closely to each firm's specific vulnerabilities. *Id.* The Board also publishes the macroeconomic scenarios it plans to use each year at the beginning of the stress test process, before the date by which each firm is required to submit firm-specific data for use in the stress test (though after the as-of date for data submissions[5]). *See, e.g.*, AR-2460-89, PageID 2500-611 (2024 Stress Test Scenarios). Beyond the specific disclosures made in the annual Methodology Disclosure and scenario disclosure, the Board also published detailed guiding principles and guardrails regarding its approach to stress testing in the 2019 Disclosure and Policy Statements. In particular, the

---

[5] The timing of the announcement of the scenarios is intended to maintain the "test" element of the stress tests, to avoid temporary pre-positioning of firms' balance sheets.

8

Stress Testing Policy Statement generally establishes guiding principles and assumptions that the Board uses for stress test modeling, including its approach to phasing in material changes. AR-35-42, PageID 179-86 (84 Fed. Reg. 6,664-71). The Scenario Policy Statement describing the Board's framework for scenario design limited the scope of surprise in the scenarios by describing the types of variation that the Board would consider and establishing ranges for variation of several key driving variables. AR-43-56, PageID 187-200 (84 Fed. Reg. 6,651-64).

The Board has established a robust process to ensure model quality, which includes an independent group responsible for validating the models used each year. AR-2370, PageID 2492 (2024 Supervisory Stress Test Methodology). The Board also engages with an external model validation council composed of independent academic experts to obtain advice on its model validation program and activities. *Id.* In addition, the Board hosts regular symposia and research conferences to engage with industry and academia on issues related to stress test modeling.[6]

### B.  The Stress Capital Buffer Requirement

The 2020 Rule links the results of the supervisory stress test to the Board's determination of the SCB requirement for each firm subject to the Board's Capital Plan Rule.[7] The SCB requirement is an estimate of the amount of capital that a firm needs to absorb potential losses and continue functioning during a severe economic downturn, based on the firm's unique risk profile. AR-1, PageID 145 (85 Fed. Reg. 15,576). The determination of a firm's SCB requirement is a case-specific decision that depends primarily on the historical composition of each firm's balance sheet; the scenarios which the Board chooses to apply in a given year; the

---

[6] *See, e.g.*, https://www.bostonfed.org/news-and-events/events/federal-reserve-stress-testing-research-conference/2024.aspx.

[7] *See* 12 C.F.R. §§ 225.8, 238.170.

Board's loss and revenue models; and any adjustments to the historical data and models which the Board determines are necessary to produce reasonable projections. *See, e.g.*, 12 C.F.R. Part 252 App'x A & B; 12 C.F.R. § 225.8(f).

A firm's SCB requirement is equal to the greater of either (1) 2.5 percent of the firm's risk-weighted assets; or (2) the calculation based on the results of a supervisory stress test, inclusive of the firm's planned common stock dividends during the effective period of the SCB requirement. AR-3, PageID 147 (85 Fed. Reg. at 15,578); 12 C.F.R. §§ 225.8(f)(2), 238.170(f)(2). If a firm's actual capital level falls below the sum of the minimum capital requirement plus applicable capital buffer requirements, the firm is subject to automatic restrictions on capital distributions and on discretionary employee bonus payments until the firm's actual capital level again surpasses the minimum-plus-buffer requirement. 12 C.F.R. § 217.11(c). The Board generally determines SCB requirements annually in connection with the yearly supervisory stress test, although the Board's regulations contemplate the possibility of off-cycle stress tests and SCB requirements. 12 C.F.R. §§ 225.8(f)(3), 238.170(f)(3).[8]

## C. Reconsideration Requests From Firms Regarding SCB Requirements

After running each firm's individual balance sheet data through the models and applying an initial internal control process, the Board notifies each firm subject to the stress test framework of its preliminary SCB requirement. The Board provides each firm an opportunity to

---

[8] Under the Dodd-Frank Act, as amended by the Economic Growth, Regulatory Relief, and Consumer Protection Act, firms with total consolidated assets greater than or equal to $100 billion but less than $250 billion are subject to "periodic" supervisory stress tests, while firms with $250 billion or more in total consolidated assets are subject to annual supervisory stress tests. 12 U.S.C. §§ 5365(i)(1), 5365 note. The Board's regulations accordingly provide for annual supervisory stress tests for firms with $250 billion or more in total consolidated assets and biennial supervisory stress tests for firms with at least $100 billion but less than $250 billion in total consolidated assets. 12 C.F.R. §§ 225.8(f)(1), 238.132(c)(1), 238.170(f)(1), 252.44(d)(1).

request reconsideration of the preliminary SCB requirement within fifteen calendar days. 12 C.F.R. §§ 225.8(h)-(i), 238.170(h)-(i). In adopting the reconsideration procedures, the Board explained that the "procedures [are] intended to provide a firm with an opportunity to respond to its [SCB] requirement . . . and to help ensure that the [SCB] requirement is appropriately sized." AR-10, PageID 154 (85 Fed. Reg. 15,585). Moreover, "[t]he reconsideration process is intended to provide the firm with a meaningful opportunity to request reconsideration of the [SCB] requirement . . . including through the presentation of additional information, while promoting an efficient process." *Id.* Accordingly, reconsideration requests must include "a detailed explanation of why reconsideration should be granted (that is, why a [SCB] requirement should be reconsidered)" and, for any new information not previously included in the firm's capital plan, "an explanation of why the information should be considered." *Id.*; *see also* 12 C.F.R. §§ 225.8(i)(3)(i), 238.170(i)(3)(i).

As part of the reconsideration process, firms are permitted to request a discretionary informal hearing. AR-10, PageID 154 (85 Fed. Reg. at 15,585); 12 C.F.R. §§ 225.8(i), 238.170(i). Within 30 days following the conclusion of the informal hearing, or within 30 calendar days of a request absent a hearing, the Board generally notifies the requestor of its decision to affirm or modify its SCB requirement. AR-10, PageID 154 (85 Fed. Reg. at 15,585); 12 C.F.R. §§ 225.8(i)(4)(ii), 238.170(i)(4)(ii).

A group of experts within the Federal Reserve System ("FRS") that is independent of the staff who developed the models analyzes the requests for reconsideration. *See* August 23, 2024 Letter to The Goldman Sachs Group at 4-5 ("Goldman Sachs Letter").[9] This independent group

---

[9] *Available at*
https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20240828a1.pdf.

(the "System Model Validation group" or "SMV group") is composed of staff members across the Federal Reserve System who are subject-matter experts and who are not involved in the supervisory modeling. AR-2370, PageID 2492 (2024 Supervisory Stress Test Methodology).[10] The SMV group considers all aspects of a reconsideration request to evaluate their validity, including, among other things, whether the request points to any errors in the firm's stress test results (along with whether the input data to the stress test were treated appropriately) and whether each stress test model identified in the request is operating as intended, within the bounds of the Board's published policies. *See*, *e.g.*, Goldman Sachs Letter at 5 (granting Goldman Sachs's request for reconsideration of its preliminary SCB requirement and modifying the firm's preliminary SCB requirement in response to the request).

Firms are afforded additional flexibility by the opportunity to adjust their planned distributions during the stress test process, which has a direct effect on their final SCB requirement. In response to their preliminary SCB requirements, each firm may evaluate whether its planned capital distributions are consistent with its preliminary SCB requirement and adjust distributions accordingly. 12 C.F.R. §§ 225.8(h)(2)(ii), 238.170(h)(2)(ii). In this process, firms may increase their previously planned capital distributions if consistent with their preliminary SCB requirements.

Following this process and any reconsideration requests, the Board provides each firm with its final SCB requirement and confirmation of the firm's final planned capital distributions. 12 C.F.R. §§ 225.8(h)(4)(i), 238.170(h)(4)(1). A final SCB requirement in connection with the

---

[10] *Available at* https://www.federalreserve.gov/publications/files/2024-march-supervisory-stress-test-methodology.pdf.

annual supervisory stress testing cycle is generally provided by August 31 of that year and

generally becomes effective on October 1 of that year. 12 C.F.R. §§ 225.8(h)(4), 238.170(h)(4).

### D. The Board's Actions to Simplify the Stress Testing Framework and to Promote Transparency

Since instituting the supervisory stress tests, the Board has continued to refine and

simplify the stress testing framework and "has gradually increased the breadth of its public

disclosures [regarding the process], which allows the public to evaluate the fundamental

soundness of the supervisory stress test and can increase public and market confidence in the

results of the assessment." AR-774, PageID 918 (Dodd-Frank Act Stress Test 2019: Supervisory

Stress Test Methodology). During routine reviews of the stress testing framework, the Board has

sought and received feedback regarding the transparency of the supervisory stress test. *Id.*

Specifically, in 2017, the Board sought public comment on the 2019 Disclosure and Policy

Statements. AR-86-115; PageID 230-59 (82 Fed. Reg. 59,547, 82 Fed. Reg. 59,528, 82 Fed. Reg.

59,533). The documents ultimately finalized and issued in the Federal Register on February 28,

2019, included: (1) the Enhanced Model Disclosures, AR-31, PageID 175 (84 Fed. Reg. 6,784);

(2) the Scenario Policy Statement, AR-43, PageID 187 (84 Fed. Reg. 6,651); and (3) the Stress

Testing Policy Statement, AR-56, PageID 200 (84 Fed. Reg. 6,664). In addition, in 2018, the

Board sought public comment on a rule to simplify various aspects of the capital framework,

including the stress test framework. This rule was finalized and published in the Federal Register

on March 18, 2020. AR 1, PageID 145 (85 Fed. Reg. 15,576), Regulations Q, Y, and YY:

Regulatory Capital, Capital Plan, and Stress Test Rules. As discussed below, the Disclosure, two

Policy Statements, and 2020 Rule reflect the Board's continued efforts to promote transparency

in the stress test process while also ensuring the effectiveness of the framework.

### 1. Enhanced Model Disclosures

The Enhanced Model Disclosures specifically sought comment on whether the Board should enhance the disclosures of the stress test models. AR-32-34, PageID 176-78 (84 Fed. Reg. at 6,785-87). The Board made clear that it believed "there are material risks associated with fully disclosing the models to the firms subject to the supervisory stress test," explaining that one downside to releasing all of the model details was that firms might use the models to change their businesses in ways that would improve their stress test results, but would not actually change the risks that the firms face. AR-32, PageID 176 (*Id.*) Thus, the stress test could give an incorrect picture of a firm's actual vulnerabilities. *Id.* The Board also expressed concern that releasing the details of the Board's models could increase correlations in asset holdings of the largest banks, which would make the financial system more vulnerable to adverse shocks. *Id.* The Board noted that disclosing the model details could "incent banks to simply use models similar to the Federal Reserve's rather than build their own capacity to identify, measure, and manage risk," which "would create a 'model monoculture' in which all firms have similar internal stress testing models." *Id.*[11] This model monoculture could result in firms missing key idiosyncratic risks to which they are exposed. *Id.*[12]

---

[11] Under the Dodd-Frank Act, firms are required to conduct their own internal stress tests and to submit reports to the Board regarding these tests. 12 U.S.C. § 5365(i)(2); 12 C.F.R. Part 238 Subpart P, Part 252 Subpart F.

[12] These risks are well recognized in the academic literature regarding regulatory stress testing. *See, e.g.*, Itay Goldstein & Yaron Leitner, *Stress Tests Disclosure: Theory, Practice, and New Perspectives*, Handbook of Financial Stress Testing, 208–23 (J. Farmer, et al. eds., 2022); Keeyoung Rhee & Keshav Dogra, *Stress Tests and Model Monoculture*, 152 J. Fin. Econ. 1–24 (2024); Baudino et al., *Stress-Testing Banks – A Comparative Analysis*, Bank for International Settlements (Nov. 2018), *available at* https://www.bis.org/fsi/publ/insights12.pdf.

The Board received twelve comments on the proposed Enhanced Model Disclosures, and the commenters were divided on the degree of model transparency that they believed was appropriate. AR-33, PageID 177 (*Id.* at 6,786). Some commenters recommended full disclosure, while others thought that the Board should disclose only certain material aspects of the models to enable the public to evaluate the reliability of the stress test results. *Id.* Finally, some commenters opposed full transparency, indicating that "it is important for the stress test to remain flexible and for it not to be perfectly predictable by the companies subject to it." *Id.* One such commenter cited the example of the Office of Federal Housing Enterprise Oversight ("OFHEO") stress test, arguing that full disclosure of the OFHEO stress test rendered the stress test ineffective. *Id.*

The Board ultimately determined that "[m]ore detailed disclosures can enhance the credibility of the stress test and lead to its improvement, but full disclosure of all details related to supervisory models could make the financial system at large more vulnerable by allowing firms to make modifications to their businesses that would change their supervisory stress test results without materially changing their risk profile." *Id.* The Board thus concluded that its approach struck an appropriate balance between enhancing model transparency and preserving the effectiveness of the stress test. *Id.* The Board made clear that it "intend[ed] to continue to improve its disclosures and to consider ways to further increase the transparency of the stress test." *Id.*

### 2. *Scenario Policy Statement*

The Board simultaneously issued the Scenario Policy Statement, which amended the Board's 2013 Policy Statement on Scenario Design Framework. AR-43, PageID 187 (84 Fed. Reg. 6,651). In this policy statement, the Board adopted specific revisions to its approach to developing the stress testing scenarios, such as changing the method by which it would generate

the unemployment rate incorporated in the severely adverse scenario if the stress test is conducted during a period when the unemployment rate is already high. AR-44-45, PageID 188-89 (*Id*. at 6,652-53). In addressing the comments that were submitted on the proposed policy statement, the Board noted that commenters had opposing views about whether the annual stress test scenarios should be published for notice and comment. AR-46, PageID 190 (*Id*. at 6,654). The Board stated that it was "considering these comments and weighing the costs and benefits of publishing the scenarios for comment." *Id.* Some commenters requested that the Board disclose the stress test scenarios in early January of each calendar year. *Id*. In response, the Board found that, "[g]iven the need to appropriately incorporate data from major data releases and other information released prior to scenario publication into the final scenarios, it is infeasible for the Board to publish the scenarios in early January." *Id.*

       3.    *Stress Testing Policy Statement*

The final policy statement issued on February 28, 2019, was the Stress Testing Policy Statement. This document described the Board's approach to developing, implementing, using, and validating the Board's supervisory stress test models, and complemented the Board's Scenario Policy Statement. AR-35, PageID 179 (84 Fed. Reg. 6,664). This statement included seven principles that had guided stress test modeling in the past and would continue to guide the process going forward. *Id.* For example, the Board decided to maintain independence as a central principle of supervisory stress testing, noting that studies have shown that firms' own models often produce materially different estimates of expected losses for the same portfolios, so relying on firm models could result in material differences in assessment of post-stress capital ratios across firms with similar risk profiles. AR-36, PageID 180 (*Id.* at 6,665). Another principle that the Board determined to maintain was conservatism in the process. *Id.* Commenters generally

agreed with maintaining this principle because the massive economic costs of another financial collapse counseled erring on the side of caution. *Id.* The Board further determined generally to not disclose information to covered companies regarding the stress test unless that information is also publicly disclosed, AR-37, PageID 181 (*id.* at 6,666), and decided to phase in the most material changes to the models over two years so as not to introduce excess volatility into the supervisory stress test. *Id.*

####         4.        *2020 Regulatory Capital, Capital Plan, and Stress Test Rules*

In addition to publishing and seeking comment on the 2019 Disclosure and Policy Statements, the Board adopted the 2020 Rule, following notice and comment, to simplify the Board's capital framework while preserving strong capital requirements for firms. AR-1, PageID 145 (85 Fed. Reg. 15,576). The 2020 Rule established that the Board would use the results of the supervisory stress test in determining each firm's SCB requirement. *Id.* The SCB requirement replaced each firm's prior fixed 2.5 percent of risk-weighted assets capital conservation buffer requirement, such that firms that did not maintain capital ratios above certain designated levels inclusive of the SCB requirement would face restrictions on their capital distributions and discretionary bonus payments. *Id.* Before promulgating the 2020 Rule, the Board received twenty-six comments from banking firms, public interest groups, private individuals, and other interested parties on the proposed rule. AR-2, PageID 146 (*Id.* at 15,577).

With regard to the portions of the proposal that addressed the stress testing framework, some commenters suggested that the scenarios were implausibly severe and caused firms to maintain more capital than necessary to withstand stressful conditions. AR-14, PageID 158 (*Id.* at 15,589). In response, the Board pointed to Appendix A to 12 C.F.R. Part 252, which describes how "severely adverse scenarios are designed to be plausible, relevant, and guided in large part

by historical experience in severe U.S recessions." *Id.* The Board also stated that it may make appropriate adjustments that are historically less typical in order to account for systemic risks. *Id.*

Some commenters also recommended that the Board enhance the transparency of the scenario design process and suggested that the Board should publish each year's severely adverse scenario for notice and comment. AR-5, PageID 149 (*Id.* at 15,580). Other commenters raised concerns that publishing the scenario for comment "may lead to pressure to not include salient risks that reflect current market conditions." *Id.* Some commenters suggested that the Board enhance the transparency of the models used in the stress tests by publishing model specifications for comment. AR-14; PageID 158 (*Id*. at 15,589). Another commenter opposed providing more information about the models because it could lead to firms adopting models similar to the Board's supervisory models, which could cause common weaknesses that could threaten financial stability. *Id.* The Board noted that it had already taken actions in 2013 and with the 2019 Disclosure and Policy Statements to increase the transparency of the stress testing framework. AR-6, PageID 150 (*Id.* at 15,581). The Board pointed out that the methodology for the supervisory stress test was not a part of the Proposed Rule, but the Board had separately taken steps to respond to these comments in the 2019 Disclosure and Policy Statements. AR-14; PageID 158 (*Id.* at 15,589).

5.      *2024 and 2025 Board Actions*

In December 2024, the Board issued a press release noting that it intends to seek public comment on changes to improve the transparency of the stress tests and reduce the volatility of the associated capital buffer requirements. December 23, 2024 Press Release, Board of Governors of the Federal Reserve System ("December 2024 Press Release").[13] These proposed

---

[13] *Available at* https://www.federalreserve.gov/newsevents/pressreleases/bcreg20241223a.htm.

changes include: 1) disclosing and seeking comment on the stress testing models; 2) averaging results over a two-year period to reduce year-over-year changes in the stress test capital requirements; and 3) seeking public comment each year on the annual scenarios. *Id*. The Board explained that it is considering these changes to improve the resiliency of the stress tests, *id.*, consistent with its statement in the 2020 Rule that "the Board believes that it is prudent to periodically review its regulations to ensure that they are achieving their goals in an effective and efficient manner." AR-2, PageID 146 (85 Fed. Reg. at 15,577).

Earlier this month, the Board sought comment on a proposal aimed at reducing the volatility of the capital requirements resulting from the annual stress test results. *See* April 17, 2025 Press Release, Board of Governors of the Federal Reserve System.[14] The Board noted that it was the first of several actions previewed by the Board's 2024 Press Release that would implement significant stress test changes. *Id.* The proposal sought comment on (1) "averaging stress test results over two consecutive years to reduce the year-over-year changes in the capital requirements that result from the stress test"; and (2) delaying the effective date of the annual SCB requirement from October 1 to January 1 of the following year, which would give firms more time to adjust to their new capital requirements. *Id.* The proposal would also make changes to streamline the process for the collection of the Capital Assessment and Stress Testing Data used in the stress tests. *Id.* The Board stated that, later in 2025, it would propose changes to

---

[14] *Available at* https://www.federalreserve.gov/newsevents/pressreleases/bcreg20250417a.htm (April 2025 Press Release) (referencing 90 Fed. Reg. 16,843 (Apr. 22, 2025)).

improve the transparency of the stress test framework, including seeking public comment on the scenarios and models utilized in the process. *Id.*[15]

## ARGUMENT

**I.** **The Imposition of a Firm-Specific Stress Capital Buffer Requirement and the Models and Scenarios Used in Determining That Requirement Are Part of an APA Adjudication Committed to Agency Discretion and Are Not Legislative Rules**

Contrary to Plaintiffs' arguments, the imposition of a firm-specific annual or biennial SCB requirement is the result of an APA adjudication that is committed to agency discretion by law, and the models and scenarios used as tools in that process are not legislative rules. As described above, this firm-specific adjudication is carried out under the Board's stress test framework using firm-specific data, common macroeconomic scenarios, and the Board's stress test loss and revenue models as inputs into the generation of a firm's individual SCB requirement. AR-3-6; PageID 147-50 (85 Fed. Reg. 15,578-81).

The Board has broad discretion to determine whether to take action by promulgating a rule or by undertaking an adjudication. *See SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947) (choice between rulemaking or adjudication "is one that lies primarily in the informed discretion of the administrative agency"); *NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 294 (1974) (decision to proceed through adjudication is "entitled to great weight," particularly where the facts and circumstances of different parties "vary widely"). The APA defines a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . ." 5 U.S.C. § 551(4). In contrast, the APA defines an "adjudication" as the "process for the formulation of an order,"

---

[15] The Board currently publishes a detailed annual Methodology Disclosure regarding the models used in the stress test, which firms receive at the time they receive their preliminary SCB requirement.

which includes "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency . . ." *Id.* at § 551(6)-(7).

Supreme Court decisions delineate two key distinctions between a rulemaking and an adjudication. *See Safari Club Int'l v. Zinke*, 878 F.3d 316, 332 (D.C. Cir. 2017). First, rules typically announce requirements "generally applicable" to a class of persons, whereas adjudication involves case-specific determinations through "a particularized order," affecting specific individuals or entities, based on "individual grounds." *Id.* Second, rules only have "future effect," whereas adjudications result in legally binding consequences based on past actions or events. *Id.* at 332-33; *Conference Group, LLC v. FCC*, 720 F.3d 957, 966 (D.C. Cir. 2013) ("The fact that an order rendered in an adjudication 'may affect agency policy and have general prospective application,' does not make it a rulemaking subject to APA section 553 notice and comment.") (citing *N.Y. State Comm'n on Cable Television v. FCC*, 749 F.2d 804, 814 (D.C. Cir. 1984)). The Board's SCB requirement satisfies both criteria to constitute an adjudication under the APA.

Further, Congress committed these adjudications, which set firm-specific capital requirements, to the Board's discretion by law. Specifically, the International Lending Supervision Act ("ILSA") gives the Board discretion to set firm-specific capital requirements and to issue a legally enforceable and unreviewable directive requiring each covered banking institution to come into compliance with the capital minimum. 12 U.S.C. § 3907. Section 10 of Home Owners' Loan Act ("HOLA") also provides the Board with the authority to issue these orders for SLHCs. 12 U.S.C. § 1467a(g)(1).

### A.    Setting a Firm's SCB Requirement Is a Case-Specific Determination

By its nature, the process of determining an individual firm's annual or biennial SCB requirement incorporates individualized determinations at multiple stages of the process. A firm

is subject to the test annually or biennially based on its individual size, and setting a firm's SCB requirement is a substantially retrospective exercise because the key information driving an individual firm's SCB requirement is its historical data.

### 1. Firm-Specific Data Drive Stress Test Outputs

Setting each firm's SCB requirement is an individualized determination because the firm's particular calculation is primarily driven by the financial condition of the firm itself and decisions made by the firm regarding planned capital distributions. A firm's SCB requirement is equal to the greater of either (1) 2.5 percent; or (2) the sum of its stress test losses calculated in a supervisory stress test and its planned common stock dividends. 12 C.F.R. §§ 225.8(f)(2), 238.170(f)(2); AR-3, PageID 147 (85 Fed. Reg. at 15,578). In conducting the annual or biennial supervisory stress test for a given firm, Board staff calculate the firm's individual stress losses by applying the Board's stress test models to the firm's firm-specific data to generate its individual projected losses across assets and asset classes. These loss projections are ultimately used as an input to determine a firm's SCB requirement. Thus, the primary data used to determine the output of a firm's stress test relates to the particularized facts and circumstances of that firm's financial condition and unique risk profile.[16]

### 2. The Board Exercises Discretion When Applying Scenarios and Adjustments to Model Inputs and Outputs in Conducting Each Firm's Individual Stress Test

The individualized and discretionary nature of determining a firm's SCB requirement is further demonstrated by the fact that the Board retains authority to set the number and type of

---

[16] For instance, of the 32 banks subject to SCB requirements in 2024, 19 different SCB requirements were determined, ranging from 2.5% to 13.9%. *See* AR 2289, Page ID 2411 (Large Bank Capital Requirements (Aug. 2024)).

severely adverse scenarios that are included in each firm's supervisory stress test. These scenarios, in turn, are used as an input to determine a firm's ultimate SCB requirement. Under the Board's supervisory stress test framework, the Board is required to use "a minimum of two different scenarios, including a baseline and a severely adverse scenario." 12 C.F.R. §§ 238.132(b), 252.44(b). The applicable regulations set a floor, but not a ceiling, on the number of scenarios required to be included in the supervisory stress test. Indeed, the Board's Scenario Policy Statement explains that, "[w]hile the Board generally expects to use the same scenarios for all companies . . . , it may require a subset of companies—depending on the company's financial condition, size, complexity, risk profile, scope of operations, or activities, or risks to the U.S. economy—to include additional scenario components or additional scenarios that are designed to capture different effects of adverse events on revenue, losses, and capital." AR-48, PageID 192 (84 Fed. Reg. at 6,656). The Board has the discretion to select the firms to which additional scenarios will apply, based on the Board's understanding of that specific firm's complexity and profile. The Board also has the flexibility to decide whether, and which of, these additional scenarios or components will impact the firm's ultimate capital requirements. For example, the Board customarily subjects certain firms to a global market shock component and a largest counterparty default ("LCPD") component in the stress test, and then exercises its discretion as to whether to incorporate these components into a particular firm's SCB requirement. Firms subjected to the LCPD component receive a letter explaining at a high level the reasons that component is being applied to the firm that year. *See, e.g.*, AR-2467, PageID

2589 (2024 Stress Test Scenarios) (identifying the firms subject to the LCPD component of the stress test in 2024).

Additionally, and in keeping with the Scenario Policy Statement, the Board also retains discretion in the design of the macroeconomic scenarios used in conducting that year's stress test. As noted above, the Board uses models to help identify the path and values of thousands of specific scenario data points (for instance, the unemployment rate, the exchange rates between different currencies, and many more). However, the Board also retains discretion in developing the overall scenario narrative and in modifying the scenario, as appropriate, to respond to specific economic conditions.

Similarly, the Board occasionally exercises case-specific discretion in determining whether to apply overlays to firm-specific data prior to application of the stress test models to produce the firms' final results. For example, as needed, the Board may make changes to how a firm has classified income to make the stress test results more reasonable if the classifications made by the firm would have otherwise produced unusual and excessively volatile results in computing net revenue. Additionally, the Board could make data adjustments if the models produced unreasonable results because of a significant unique circumstance such as a firm's recent divestiture of a large asset. The Board also routinely collects additional data from certain firms, via special collections, to account for factors not routinely considered by the supervisory models and adjusts the models and data inputs as necessary. *See* 12 C.F.R. §§ 238.133(b), 252.45(b); *see also*, *e.g.*, Board of Governors of the Federal Reserve System, Dodd-Frank Act Stress Test 2020: Supervisory Stress Test Results, at 18 (June 2020) ("The Federal Reserve modified the estimate of losses on private equity investments in affordable housing that qualify as Public Welfare Investments (PWI) under Regulation Y. . . . The Federal Reserve collected

24

additional information to refine its approach to identifying these investments and estimating their losses.").[17] As such, each SCB requirement is based on individualized grounds and does not have general applicability.[18]

### 3. The Board Exercises Discretion in Determining Which Stress Test to Use When Setting a Firm's SCB Requirement

The Board's regulations also allow the Board to determine which stress test to use based on the Board's expertise and knowledge about individual firms. In practice, the Board generally uses the results of that year's normal-course supervisory stress test; however, in some circumstances, it may be the case that the results are incapable of adequately representing a specific firm's actual risk profile and establishing a well-calibrated SCB requirement. In such circumstances, the Board has authority to rely on the results of a different supervisory stress test. The Board's regulations specify that a firm's SCB requirement will be determined based on stress test losses and dividend add-ons obtained "under *a* supervisory stress test." 12 C.F.R. §§ 225.8(f)(2)(i), 238.170(f)(2)(i) (emphasis added). However, the rule does not specify which supervisory stress test upon which a firm's SCB requirement must be based, leaving the Board the discretion to determine, on a case-specific basis, that a given year's test—for any number of reasons—is an inappropriate measure of a given firm's actual risk profile. In such a circumstance, the Board can choose to administer a new, off-cycle supervisory stress test or use a different year's test in determining that firm's applicable SCB requirement. For instance, the

---

[17] *Available at* https://www.federalreserve.gov/publications/files/2020-dfast-results-20200625.pdf.

[18] Similarly, the Board recently granted a reconsideration request by The Goldman Sachs Group, Inc. and "modified the preliminary SCB requirement previously provided to Goldman Sachs from 6.4 percent to 6.2 percent." *See* Goldman Sachs Letter. In reaching this determination, the Board took into account specific arguments related to the firm's expenses associated with the impairment of goodwill and intangibles and other expenses related to consolidated investment entities. *Id.* at 6.

Board can opt to use the prior year's stress test results for a given firm when the given year's results inappropriately measures the firm's actual risk profile due to situational factors. The fact that the Board exercises discretion in determining which stress test results will be applied to each particular firm further demonstrates the individualized nature of each SCB requirement determination.

        4.     *Determining a Firm's SCB Requirement Is a Substantially Retrospective Exercise*

Finally, an understanding of how SCB requirements are calculated shows that the process is a fundamentally retrospective exercise given the data used to conduct the analysis. In particular, the Board conducts each year's supervisory stress test using a firm's historical financial data. As noted above, a key input to the supervisory stress test is the Capital Assessment and Stress Testing Data information collection. By April 5 of each year, firms are required to submit data regarding their balance sheet and loan portfolio as of the end of the prior year. *See* Instructions for the Capital Assessments and Stress Testing Reports (Reporting Form FR Y-14A), OMB No. 7100-0341; Instructions for the Capital Assessments and Stress Testing information collection (Reporting Form FR Y-14Q), OMB No. 7100-0341.[19] Using this information, the Board calculates each firm's individual SCB requirement. Furthermore, firms' SCB requirements, calculated based on the prior year's data, do not actually become effective until October 1—a full nine months from the FR Y-14 report as-of-date. 12 C.F.R. §§ 225.8(h)(4), 238.170(h)(4). A capital consequence in the form of a firm's new SCB requirement does not

---

[19] *Available at*
https://www.federalreserve.gov/apps/reportingforms/Download/DownloadAttachment?guid=a900de15-6420-482b-affc-5a0b20ec5369 (p. 6-8);
https://www.federalreserve.gov/apps/reportingforms/Download/DownloadAttachment?guid=83c6e71a-86c2-40b6-a9a5-16e15ca7d2d8 (p. 7-8)

become binding on a firm until nine months after its past actions and decisions regarding the composition of its balance sheet and loan portfolios for a given year. Thus, calculation of the SCB requirement is substantially retrospective. *See, e.g.*, *Conference Group, LLC*, 720 F.3d at 966; *Neustar, Inc. v. FCC*, 857 F.3d 886, 895 (D.C. Cir. 2017).

### B.   The ILSA and HOLA Statutes Commit Adjudication Decisions Related to SCB Requirements to the Board's Discretion

The Board has explicit authority and unreviewable discretion under ILSA to conduct adjudications to set firm-specific capital requirements for affiliates of insured depository institutions. 12 U.S.C. §§ 3907, 3909(a)(2), 5311. Section 10 of HOLA also provides the Board with the authority to issue orders for SLHCs, including "orders relating to capital requirements" "as the Board deems necessary or appropriate" to carry out the purposes of the statute. 12 U.S.C. § 1467a(g)(1). These actions are committed to agency discretion by law.

### 1.   *ILSA Grants the Board Discretion to Impose Minimum Capital Requirements*

The APA generally provides the right to judicial review and thereby waives sovereign immunity in cases where "a person [is] suffering legal wrong because of agency action, or [is] adversely affected or aggrieved by agency action." 5 U.S.C. § 702. The waiver of sovereign immunity under the APA is limited however, "to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(1)-(2).

Under ILSA, the Board has the authority to "establish such minimum level of capital for a banking institution as [the Board], *in its discretion*, deems to be necessary or appropriate in light of the particular circumstances of the banking institution." 12 U.S.C. § 3907(a)(2) (emphasis added). If a banking institution fails to meet or maintain the minimum level of capital, ILSA empowers the Board to issue a legally enforceable capital directive requiring the banking institution to come into compliance with the capital minimum. 12 U.S.C. § 3907(b)(2)(A). The

27

Board, "in its discretion," may also seek a federal court order to enforce such a capital directive, and a court cannot "review, modify, suspend, terminate, or set aside" such directive. 12 U.S.C. § 3907(b)(2)(B)(ii).[20] The Board is also empowered "in its discretion" to "deem[]" such failure an unsafe and unsound practice and bring an enforcement action under 12 U.S.C. § 1818. 12 U.S.C. § 3907(b)(1).

ILSA commits adjudication decisions related to firm-specific capital minimums to the Board's discretion under the standard set out in 5 U.S.C. § 701(a), and thus excludes these decisions from judicial review under the APA. Courts that have considered the issue uniformly agree with this interpretation. Indeed, in *Frontier State Bank Oklahoma City v. FDIC*, the Tenth Circuit found that ILSA "forecloses our review of the FDIC's imposition of capital requirements because it commits the setting of capital levels to the FDIC's discretion without giving us any standard to determine the correctness of the FDIC's decision." 702 F.3d 588, 597 (10th Cir. 2012) ("[ILSA] reflects Congress' view that banking regulators – not courts – are in the best position to judge banks[] . . . . Congress is permitted to prioritize the safety of the banking system over banks' interest in avoiding subjective or even harsh agency decisions."). In *FDIC v. Coushatta*, the Fifth Circuit likewise concluded that the "issuance of a [capital] directive is committed to the FDIC's discretion" and is thus unreviewable. 930 F.2d 1122, 1129 (5th Cir. 1991); *see also Transohio Sav. Bank v. Director, Office of Thrift Supervision*, Civ. A. No. 90–1678, 1991 WL 201178, at *5 (D.D.C. Aug. 1, 1991) ("[T]he Court need look no further than the

---

[20] This statutory provision cross-references 12 U.S.C. § 1818(i), which states that "[t]he appropriate Federal banking agency may in its discretion apply to [federal courts] for the enforcement of any effective and outstanding notice or order issued . . . , and such courts shall have jurisdiction and power to order and require compliance herewith; but except as otherwise provided in [specified provisions,] . . . no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order under any such section, or to review, modify, suspend, terminate, or set aside any such notice or order."

plain language of the statute to determine that it provides OTS with unfettered discretion in establishing capital levels on a case-by-case basis.").[21]

Consistent with ILSA, the SCB requirement is a minimum capital level[22] for a firm set "in light of the particular circumstances of the firm" for the reasons discussed in section I.A-C above. As such, the Board's process of assigning banking institutions' individual SCB requirements comes from the authority designated in ILSA, and these SCB requirements are not substantively reviewable by courts under the APA.

> 2. HOLA Grants the Board Discretion to Impose Minimum Capital Requirements on SLHCs

Section 10 of HOLA also gives the Board authority to issue orders, including "orders relating to capital requirements" for SLHCs "as the Board deems necessary or appropriate" to carry out the purposes of the section. 12 U.S.C. § 1467a(g)(1); *see also Webster v. Doe*, 486 U.S. 592, 600-01 (1988) (determining the statutory language "deem . . . necessary or advisable" sufficient to preclude reviewability of agency action). This statutory language is drawn "so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Notably, the Sixth Circuit has found that the grant of discretion under section 10 of HOLA was sufficient to preclude judicial review of the OTS's decision not to bring an enforcement action based on the similarity between the

---

[21] Courts have looked at ILSA as a whole when reaching these determinations. *See, e.g.*, *Transohio Sav. Bank*, 1991 WL 201178, at *7 (finding that plaintiffs' attempt to distinguish between individual minimum capital requirements and enforcement mechanisms "reveals that it is a distinction without a difference"—"Congress sought to preclude judicial review of the process by which OTS sets appropriate capital levels and, in any event, committed the process to the agency's discretion").

[22] The SCB requirement is a minimum capital level because firms that do not meet the SCB requirement face automatic restrictions on capital distributions and bonus payments.

29

statutory language of HOLA and ILSA, as interpreted by the Fifth Circuit in *Coushatta*. *United Liberty Life Ins. Co. v. Ryan*, 985 F.2d 1320, 1327 (6th Cir. 1993) ("Although *Coushatta* only discussed the capital directives issued by FDIC, its reasoning applies to OTS as well, because OTS possesses analogous powers over savings and loan institutions . . . . Therefore, we conclude that the decisions taken by OTS and FDIC not to enforce the stipulation are agency actions not subject to judicial review under the APA."). The issuance of SCB requirements for SLHCs is consistent with HOLA given the broad, ILSA-like language in the statute authorizing the Board to issue orders, including "orders relating to capital requirements" for SLHCs "as the Board deems necessary or appropriate" to carry out the purposes of the statute, and, as such, these requirements are not judicially reviewable. 12 U.S.C. § 1467a(g)(1).

C.    **The Models and Scenarios Are Not Legislative Rules That Require Notice and Comment Rulemaking**

As explained above, the Board's process to impose firm-specific SCB requirements is an adjudication. Plaintiffs, however, spend much of their brief arguing that the models and scenarios are legislative rules that require notice and comment rulemaking. Specifically, Plaintiffs contend that the models and scenarios are legislative rules because they have the force and effect of law to "impose billions of dollars in capital requirements on banks through the stress-capital buffer." Plaintiffs' Brief at 25. Plaintiffs further maintain that the models and scenarios are legislative rules because they implement express statutory delegations. *Id.* at 29. Neither of these arguments override the agency's reasoned choice to proceed under its adjudicative framework or its discretion under ILSA and HOLA.

As discussed above, the models and scenarios that Plaintiffs contend should be subject to mandatory notice and comment do not have the full force and effect of law. Rather, they are tools that are used as part of the Board's adjudicatory process, a role fully disclosed in the 2020 Rule.

30

Further, the Board retains discretion in how it uses the models and scenarios, and these models and scenarios are not purely mechanical, as Plaintiffs claim, but rather facilitate formulation of an individualized SCB requirement for a particular firm. In addition, upon initial receipt of its preliminary SCB requirement, a firm maintains the ability to adjust its planned capital distributions and/or request reconsideration of its preliminary SCB requirement, as part of the process set forth by the Board's adjudicatory framework.

In ILSA, Congress gave the Board the authority to impose minimum capital requirements through either rulemaking or adjudication. 12 U.S.C. § 3907. Congress accorded the Board discretion given its expertise relevant to the "risks of foreign and domestic lending." *See* H.R. Rep. No. 175, 98th Cong., 1st Sess. at 46 (1983); 12 U.S.C. §3901(a). Developing and implementing meaningful risk-based capital requirements requires substantial experience and is deeply fact-based—hence the statutory discretion granted by Congress. The fact that the Board is implementing express statutory delegations when imposing the SCB requirements does not turn the models and scenarios that are used as tools of an adjudicative process into legislative rules. *See Chenery*, 332 U.S. at 201. And Plaintiffs' reliance on *McLouth Steel Products Corp. v. Thomas*, 838 F.2d 1317, 1319 (D.C. Cir. 1988), and other inapposite cases, *see* Plaintiffs' Brief at 26-28, does not alter this conclusion. In *McClouth*, which involved a rulemaking proceeding, *see* 838 F.2d at 1319 n.2, the D.C. Circuit found that the Environmental Protection Agency had not provided adequate notice and opportunity for comment in failing to disclose its reliance on a model that had a "binding effect" on the rights of affected parties. *Id.* at 1322. As discussed above, that is not the case under the Board's adjudicatory framework, nor was the decision in *McClouth* and the other cited cases committed to the agency's discretion by law, as it is here.

Although Plaintiffs suggest that the Board's announcement that it will propose future changes to the stress testing framework, including seeking public comment on the scenarios and models, indicates that the scenarios and models are legislative rules, Plaintiffs' Brief at 31 (citing *Tennessee Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1045 (6th Cir. 2018)), the Board's decision to increase transparency in no way amounts to an admission that the models are legislative rules. The Board made clear in the 2020 Rule that it believes it "prudent to periodically review its regulations to ensure that they are achieving their goals in an effective and efficient manner." AR-02, PageID 146 (85 Fed. Reg. at 15,577). These forthcoming and voluntary changes are part of the Board's ongoing review of the stress test framework, which has been occurring since the inception of the stress tests.

## II. Neither the FOIA Amendments to the APA Nor the Due Process Clause Require the Board to Publish the Stress Test Models

Plaintiffs next turn to the FOIA Amendments to the APA and the Due Process Clause in search of a legal basis requiring the Board to publish the stress test models for notice and comment. These arguments also fail. At a minimum, the stress test models are subject to FOIA exemptions 5 and 7, and thus need not be published in order for the Board to utilize them in setting firms' SCB requirements. Furthermore, Plaintiffs have failed to assert a viable violation of the Due Process Clause, as Plaintiffs cannot demonstrate that lack of detailed disclosure deprives them of sufficient notice of what conduct would cause them to face limitations on their economic activities under the SCB requirement.

### A. The FOIA Amendments to The APA Do Not Require the Board to Publish the Stress Test Models

Plaintiffs incorrectly contend that provisions in FOIA, 5 U.S.C. § 552, compel disclosure of the stress testing models, and that if these models are not published, Plaintiffs cannot be

affected by an agency action based on these models.[23] Plaintiffs' Brief at 33. Plaintiffs' argument

ignores the fact that FOIA, by its own terms, is wholly inapplicable to materials falling within

one of its nine enumerated exceptions. 5 U.S.C. § 552(b) ("[t]his section does not apply to

matters that are" exempted from disclosure under 5 U.S.C. § 552(b)(1)-(9)). Because all of

section 552 is rendered inapplicable to exempt materials, such materials are not subject to public

disclosure under § 552(a). *Fed. Open Mkt. Comm. v. Merrill*, 443 U.S. 340, 360 n.23 (1979);

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 160 (1977). Here, at a minimum, the stress testing

models fall under FOIA exemptions 5 and 7, and therefore the models need not be published in

the Federal Register pursuant to § 552(a); for the same reasons, § 552(a)'s bar on agency reliance

on unpublished materials does not apply to the models.

### 1. *FOIA Exemption 5 Applies*

First, the stress test models are protected from disclosure by exemption 5, which permits

withholding of "inter-agency or intra-agency memorandums or letters that would not be available

by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This

exemption has been construed to encompass both information subject to a litigation privilege and

information that would ordinarily be entitled to a protective order "forbidding disclosure of the

confidential material therein to the general public" (or information analogous to the type of

information that is ordinarily privileged or protected). *Fed. Open Mkt. Comm.*, 443 U.S. at 361-

62; *id.* at 362 n.24.

Specifically, the models are analogous to testing materials that courts ordinarily protect

from widespread disclosure because their disclosure could allow others to "game" the test or

---

[23] The statute requires publication in the Federal Register of "substantive rules of general applicability," "statements of general policy or interpretations of general applicability," and "each amendment, revision, or repeal of the foregoing." 5 U.S.C. § 552(a)(1)(D), (E).

otherwise compromise test security. As explained above, the Board has not disclosed the models in advance in part to ensure that firms do not adjust their holdings in a way that would help them perform better during stress testing but not materially improve their actual safety and soundness. Courts have repeatedly recognized the need to protect assessment methods from disclosure, often expressly noting that such disclosure would allow those being assessed to game the test. For example, courts have recognized that employment-related assessments are often entitled to protection from disclosure in litigation. *E.g.*, *EEOC v. Kronos Inc.*, 694 F.3d 351, 367 (3d Cir. 2012), *as amended* (Nov. 15, 2012) ("Confidentiality orders have been approved in other [employment] cases where district courts ordered the disclosure of testing materials because the courts recognized the importance of maintaining the confidentiality of such documents."); *EEOC v. Aon Consulting, Inc.*, 149 F. Supp. 2d 601, 608 (S.D. Ind. 2001) ("[E]mployment tests and validation studies present an extraordinarily compelling case for confidentiality. Disclosure can simply destroy the value of the tests."); *accord Detroit Edison Co. v. NLRB*, 440 U.S. 301, 315–16 (1979) (given "the relationship between secrecy and test validity," an employer has "important interests in test secrecy"). Similarly, courts routinely enter protective orders limiting the disclosure of neuropsychological assessment tests, sometimes allowing only a party's psychological expert or attorney to access the tests rather than the party itself. *E.g.*, *Wayne v. Officer Ralph Kirk #21*, No. 13 C 8540, 2016 WL 492338, at *5–10 (N.D. Ill. Feb. 9, 2016) (citing cases) (noting the widespread practice of limiting disclosure of neuropsychological tests and ordering disclosure to be limited to a party's attorney).

Other types of assessment methodologies have also been granted protection by courts. For example, commercial fraud detection methodologies have received protection based on claims that evasion would result from disclosure. *E.g.*, *Muff v. Wells Fargo Bk. N.A.*, No. 21-CV-

4003-CJW, 2022 WL 601051, at *4-5 (N.D. Iowa Jan. 28, 2022). And a court granted an order protecting a non-profit civil rights organization's methods for assessing whether new construction is accessible to the disabled, based in part on the threat that developers could "thwart" its testing if they could access this information. *The Equal Rts. Ctr. v. Lion Gables Residential Tr.*, No. CIVA DKC 07-2358, 2010 WL 2483613, at *2–3 (D. Md. June 15, 2010). Because the stress testing models are analogous to these other assessment materials that are often subject to protective orders in litigation, they fall within the scope of FOIA exemption 5. *Fed. Open Mkt. Comm.*, 443 U.S. at 362 n.24.

### 2. *FOIA Exemption 7 Applies*

The stress testing materials are also subject to FOIA exemption 7, which applies to certain "records or information compiled for law enforcement purposes," 5 U.S.C. § 552(b)(7), where "law enforcement purposes" broadly "appl[ies] not only to information compiled for criminal enforcement purposes but also to that compiled for civil enforcement purposes." *Abraham & Rose, P.L.C. v. United States*, 138 F.3d 1075, 1083 (6th Cir. 1998). Among the law enforcement records protected by the exemption are those for which disclosure "could reasonably be expected to interfere with enforcement proceedings," or "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(A), (E). Disclosure of the stress testing models could have this effect.

Stress testing is, in part, a component of a larger supervisory inspection process that can lead to enforcement action, and releasing the models would therefore disclose "techniques and procedures for law enforcement investigations" and potentially allow regulated entities to game

the tests in a way that would "risk circumvention of the law" or "interfere with enforcement proceedings." *Id.* For example, the Board may initiate cease-and-desist proceedings when an institution is engaging in unsafe or unsound practices, 12 U.S.C. § 1818(b)(1), (3), and an assessment of the institution's present financial condition that may lead the Board to determine that it has engaged in such practices may depend, in part, on stress-testing results. *See* 12 U.S.C. § 3907(b)(1) (linking capital adequacy to safety and soundness enforcement under section 1818); *accord* 12 C.F.R. § 225.8(g)(5) (indicating that stress-testing results are a factor that the Board considers in assessing the adequacy of an institution's capital plan).

Supervisory stress test results can also affect where the Board focuses resources to enforce and ensure ongoing compliance with legal safety and soundness requirements, due to the Board's risk-focused approach, under which supervisory resources are focused on riskier institutions and riskier activities within those institutions. Board of Governors of the Federal Reserve System, Bank Holding Company Supervision Manual § 1050.0.2.2 (2024); *see also Pub. Emps. for Env't Resp. v. Int'l Boundary & Water Comm'n, U.S.-Mex.*, 740 F.3d 195, 203 (D.C. Cir. 2014) ("Law enforcement entails more than just investigating and prosecuting individuals *after* a violation of the law. . . . [T]he 'ordinary understanding of law enforcement includes . . . proactive steps designed to prevent criminal activity and to maintain security.'" (quoting *Milner v. Dep't of Navy*, 562 U.S. 562, 582 (2011) (Alito, J., concurring)); *accord Knight First Amend. Inst. at Columbia Univ. v. U.S. Citizenship & Immigr. Servs.*, 30 F.4th 318, 328 (2d Cir. 2022); *Jordan v. U.S. Dep't of Just.*, 668 F.3d 1188, 1193 (10th Cir. 2011).

Because releasing the models could potentially allow supervised institutions to "game" the stress tests, and thereby avoid the type of supervisory scrutiny or inspection findings that can lead to agency enforcement action, model disclosure could potentially lead to circumvention of

36

the law or interference with enforcement proceedings, and the models are therefore protected from disclosure by exemption 7. *Cf., e.g.*, *ACLU of Mich. v. FBI*, 734 F.3d 460, 466 (6th Cir. 2013) (agency's assertion that disclosure of records would "permit[] groups to change their behavior and avoid scrutiny . . . amply states a type of interference covered by Exemption 7(A)"); *Jones v. FBI*, 41 F.3d 238, 249 (6th Cir. 1994) (agency properly withheld materials pursuant to exemption 7(E) where disclosure "could result in subjects of FBI investigations taking additional steps to avoid detection" (quotation omitted)); *Humane Soc'y of the U.S. v. Animal & Plant Health Inspection Serv.*, 386 F. Supp. 3d 34, 49 (D.D.C. 2019) (records associated with routine food plant inspections were "law enforcement records" for purposes of exemption 7 because the inspections could lead to requests for corrective action and could "serve as the predicate for any subsequent investigation . . . that could result in civil or criminal liability"); *Small v. IRS*, 820 F. Supp. 163, 166 & n.5 (D.N.J. 1992) (holding that exemption 7(E) protected information relating to statistical models used to select taxpayers for audit, where disclosure would allow "taxpayers to circumvent the tax laws by enabling them to determine which line items on a return are likely to be significant variables in the [agency's] formula," and releasing information on tolerances used when applying the models would allow taxpayers to "devise strategies to circumvent the internal revenue laws by tailoring their returns to stay within these tolerances"). As a result, because the stress testing models are exempt from disclosure under FOIA, the FOIA Amendments to the APA do not require the Board to publish them.

## B. Nondisclosure of the Stress Test Models Does Not Violate the Due Process Clause

In addition, Plaintiffs incorrectly assert that the disclosures the Board makes concerning its stress test models are insufficient, thereby purportedly violating the due process rights of banking firms subject to the stress test. Plaintiffs contend that, without knowing more details

about the models, it is impossible for banking firms subject to the stress test to tell if they will be subjected to restrictions on their activities. As explained above, the stress testing models are a tool the Board uses to determine an individual firm's SCB requirement. The crux of Plaintiffs' argument is therefore that, without access to additional information about these models, banking firms subject to the stress test do not have sufficient notice of what activity will subject them to restrictions on their activities pursuant to the SCB requirement. Plaintiffs have failed to make the necessary showing to support such a facial challenge to the stress test on vagueness grounds.

 As an initial matter, this sort of facial vagueness challenge, ungrounded in any facts involving specific applications of the SCB requirement, is simply unavailable outside the context of enactments implicating constitutionally protected conduct, such as speech. Specifically,

> assuming the enactment implicates no constitutionally protected conduct, [a court] should uphold the challenge only if the enactment is impermissibly vague in all of its applications. A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law.

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494–95 (1982); *see also Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 557 (6th Cir. 1999) ("vagueness claims not involving First Amendment freedoms must be examined in light of the facts of the particular case at hand and not as to the statute's facial validity"). Thus, if "some conduct . . . is clearly proscribed," a facial vagueness challenge will not lie based on claims of purported uncertainty about what additional conduct might also be proscribed. *Hoffman Ests.*, 455 U.S. at 495. But Plaintiffs do not contend that there is *no* situation in which a financial institution would not "clearly" be subject to restrictions under the SCB framework. Nor could they make such an assertion, since, *inter alia*, there is a 2.5% minimum capital buffer requirement regardless of stress testing results, so an institution failing to achieve this floor would "clearly" know that it

would be subject to additional restrictions. *Cf.* 12 C.F.R. § 225.8(f)(2)(ii) (setting a 2.5% floor on the required capital buffer). Plaintiffs' attempted facial challenge therefore falls.

Moreover, Plaintiffs make no arguments addressing the specific vagueness standard applicable in the case of economic regulation and how it applies to the SCB framework. They thus make no attempt to explain, much less demonstrate, that the Board's utilization of internal stress testing models when implementing its SCB requirement (with or without the information that the Board has affirmatively disclosed about its models) deprives Plaintiffs of sufficient notice, as defined in the due process jurisprudence, of what conduct would cause them to face limitations on their economic activities under the SCB requirement. In fact, the degree of specificity that is constitutionally required to give fair notice is much more modest in the economic regulation context. Specifically, due process specificity requirements are "less strict" with respect to economic regulation than with respect to government action implicating constitutionally protected activity, and similarly less stringent with respect to civil rather than criminal enforcement. *Hoffman Estates*, 455 U.S. at 498-99. Plaintiffs have not explained how, without disclosure of the exact run code and other details of the Board's stress testing models (going beyond what the Board has already disclosed), the capital requirements of the regulation are too vague to allow regulated institutions to tailor their conduct to avoid restrictions imposed under the regulation.

Nor could Plaintiffs make a showing that, without disclosure of the stress testing models, the SCB requirement is unconstitutionally vague. Courts do not require "mathematical certainty" in order to withstand a vagueness challenge even in the much more stringent First Amendment context. *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (quotation omitted); *accord United States v. Midwest Fireworks Mfg. Co.*, 248 F.3d 563, 568 (6th Cir. 2001). Moreover, the Board provides

banking firms subject to the stress test with a methodological description of how it calculated their preliminary SCB requirement. The Board also provides firms with the ability to demonstrate that, regardless of what the Board's internal models say, their capital levels are adequate to withstand the stressed conditions simulated by the models and to argue that their SCB requirement should be lower based on their specific risks. The stress testing models are just a tool the Board uses to determine SCB requirements and are not themselves legally controlling. The 2020 Rule establishing the SCB framework, under which the Board makes discretionary decisions as described by the 2019 Disclosure and Policy Statements, controls. Plaintiffs have not demonstrated that, without knowing every last detail about the models, firms are unable to sufficiently understand what this framework requires of them.

Lastly, the Sixth Circuit has recognized that what constitutes sufficient notice under the Due Process Clause is determined in part based on "pragmatic problems associated with 'being more precise.'" *Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 552 (6th Cir. 2007). And, as explained above, disclosure of the models may lessen their effectiveness by allowing institutions to "game" the tests in a way that misleadingly suggests their capital is adequate. Thus, just as it is presumably consistent with due process notice requirements for a police department not to disclose the location and nature of its speed traps, so long as the speed limits are sufficiently clear, the Board's nondisclosure of its full stress testing models does not raise constitutional vagueness concerns with respect to the SCB requirement.

III.    **The Board's 2019 Disclosure and Policy Statements and 2020 Rule Are Not Arbitrary and Capricious**

Finally, contrary to Plaintiffs' arguments, the Board's 2019 Disclosure and Policy Statements and the 2020 Rule were neither arbitrarily nor capriciously adopted. While the Board was not required under the APA to seek public comment on the 2019 Disclosure and Policy

Statements because these actions were not legislative rulemakings, the Board nonetheless

voluntarily sought comment and adequately considered commenters' arguments that both

favored and disfavored full disclosure of the stress test scenarios and models. And, while

questions regarding the transparency of the stress test models were not a part of the 2020 Rule

proposal, the Board reviewed and adequately responded to commenters' views on this topic.

### A.    The Board Voluntarily Sought Comment on the 2019 Disclosure and Policy Statements and Adequately Responded

As explained above, the Board's 2019 stress testing agency actions were policy

statements, not legislative rulemakings. As such, the Board was not required to publish these

documents for notice and comment under the APA. *See* 5 U.S.C. § 553(b)(4)(A) (exempting

interpretive rules and general statements of policy from notice and comment). Instead, the Board

voluntarily sought comment on these proposed agency actions, which the Board and other

agencies frequently do when issuing such policy statements.[24]

The Attorney General's Manual has defined a "general statement of policy" as a

statement "'issued by an agency to advise the public prospectively of the manner in which the

agency proposes to exercise a discretionary power.'" *Guardian Fed. Sav. & Loan Ass'n v. Fed.*

*Sav. & Loan Ins. Corp.*, 589 F.2d 658, 666 (D.C. Cir. 1978) (citing U.S. Dept. of Justice,

---

[24] *See, e.g.*, *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 102 (2015) (noting that, under the APA, "[a]gencies are free to grant additional procedural rights in the exercise of their discretion, but reviewing courts are generally not free to impose them if the agencies have not chosen to grant them" (quotation omitted)); Office of Management & Budget, *Final Bulletin for Agency Good Guidance Practices*, 72 Fed. Reg. 3,432, 3,438 (2007) ("Pre-adoption notice-and-comment can be most helpful for significant guidance documents that are particularly complex, novel, consequential, or controversial. . . . As it does for legislative rules, providing pre-adoption opportunity for comment on significant guidance documents can increase the quality of the guidance and provide for greater public confidence in and acceptance of the ultimate agency judgments. For these reasons, agencies sometimes follow the notice-and-comment procedures of the APA even when doing so is not legally required.").

Attorney General's Manual on the Administrative Procedure Act 30 n.3 (1947)).[25] General

statements of policy do not have legal effect because, by their terms, they do not bind the agency

or the public; rather, they state, in a non-binding manner, the way in which the agency plans to

exercise authorities set forth in statutes or legislative rules.[26] The 2019 Disclosure and Policy

Statements do not have binding effect but rather state in a non-binding manner the way in which

the Board intends to implement its authority to conduct supervisory stress tests. As such, even if

the Board did not adequately respond to the comments received regarding these documents, that

would not constitute a violation of the APA. *See, e.g.*, *Ctr. For Auto Safety v. Nat'l Highway*

*Traffic Safety Admin.*, 452 F.3d 798, 807 (D.C. Cir. 2006) (general statements of policy are not

reviewable under the APA).

As noted above, however, the Board did adequately respond to the comments received

regarding the 2019 Disclosure and Policy Statements. As Plaintiffs detail in their opening brief,

some commenters favored full disclosure of the stress test models and scenarios arguing that this

would improve the quality and credibility of the stress tests. Plaintiffs' Brief at 14. These

commenters argued that the concern that firms might "gam[e]" or "reverse engineer[]" the

system was unfounded because the goal of the system was for firms to align their behavior with

---

[25] The Supreme Court has noted the Attorney General's Manual is "a contemporaneous interpretation [of the APA, which has been] previously given some deference by this Court because of the role played by the Department of Justice in drafting the legislation." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 546 (1978).

[26] *See, e.g.*, *Clarian Health W., LLC v. Hargan*, 878 F.3d 346, 357 (D.C. Cir. 2017) (considering whether "an action constitutes a legislative rule or a general statement of policy" and observing that courts consider several factors, including "[1] whether the agency has imposed any rights and obligations or [2] generally left the agency and its decisionmakers free to exercise discretion," as well as "[3] the agency's own characterization of the action, [4] whether the action was published in the Federal Register or the Code of Federal Regulations, and [5] whether the action has binding effects on private parties or on the agency," and noting that "the inquiry into whether the action has binding effect . . . is the most important" (cleaned up)).

the stress test's rules and standards. *Id.* These commenters maintained that if the scenarios and models were disclosed it would not be possible for a firm to improve its stress test performance in the short term without undertaking longer-term changes to its risk profile, and if it were possible for firms to make these short-term changes without achieving long-term changes, this would suggest weaknesses in the models instead of problems with disclosing them. *Id.* at 14-15. Finally, these commenters argued that concerns about the creation of a "model monoculture" were not valid because other regulations require banks to develop individualized models tailored to their risk profiles. *Id.* at 15.

On the other hand, other commenters argued against full disclosure of the models, or only supported specific partial disclosures *See supra* at 15; *see also* AR-33, PageID 177 (84 Fed. Reg. at 6,786). These commenters stated that it was important for the stress test models to remain flexible and to not be completely predictable by the companies subject to them. AR-33, PageID 177 (84 Fed. Reg. at 6,786). One commenter also cited the prior experience of the OFHEO test, asserting that full disclosure made the OFHEO stress test completely ineffective. *Id.*

After reviewing all of the submitted comments, the Board clearly articulated its rationale for not fully disclosing the models and scenarios. Ultimately, the Board determined that "[m]ore detailed disclosures can enhance the credibility of the stress test and lead to its improvement, but full disclosure of all details related to supervisory models could make the financial system at large more vulnerable by allowing firms to make modifications to their businesses that would change their supervisory stress test results without materially changing their risk profile." AR-33, PageID 177 (84 Fed. Reg. at 6,786).[27] The Board had significant concerns that disclosing the

---

[27] Plaintiffs try to contrast the Board's use of fixed risk-weight coefficients in its risk-based capital ratio requirements, which are published and generally align with Basel international

43

details of the models and scenarios would give an incorrect picture of each firm's vulnerabilities

and would make the financial system more vulnerable to adverse shocks. AR-32, PageID 176 (84

Fed. Reg. at 6,785). The Board also was influenced by its view that releasing the full details of

the models and scenarios would encourage all firms to use only the Board's models without

creating their own models, which would result in firms missing key idiosyncratic risks to which

they are exposed. *Id.*

Thus, even if the Court were to conclude that the Board was required to seek comments

and respond to these arguments, the Board's responses would satisfy the requirements of the

APA. While an agency need not respond to frivolous or irrelevant comments, or to all comments,

significant commenter arguments that require a response include those that challenge a

fundamental premise underlying a proposed rule, or contentions that, if true, would suggest a

change from the proposed rule in the final rule. *See, e.g.*, *Chamber of Com. of U.S. v. SEC*,

85 F.4th 760, 774 (5th Cir. 2023) ("Comments the agency must respond to include those that 'can

be thought to challenge a fundamental premise underlying the proposed agency decision' or

include points that 'if true and adopted would require a change in an agency's proposed rule'"

(quoting *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019)) (cleaned

up)). An agency retains discretion in responding to comments and deciding whether to adopt

commenter suggestions in the final rule, so long as the agency's response is reasonably explained

---

capital standards, with the Board's stress test models. Plaintiffs' Brief at 20-21, 31-32, 38. These
two situations are distinct. The Board's risk-based capital ratio requirements set ongoing, static
requirements that firms use to calculate their capital ratios, using fixed, comparable risk-weights
that apply in all market environments. By contrast, stress testing is a supervisory tool intended to
capture idiosyncratic, granular risks, based on the firm's balance sheet and business decisions, in
specific stressed market environments, allowing for greater firm-specific precision than the
static, comparable risk weights used in risk-based capital rules.

and allows a reviewing court to fully understand the issues of policy that were ventilated through the comment process and the reasons why the agency decided to accept or reject commenter arguments. *Carlson*, 938 F.3d at 344. Given the circumstances pursuant to which the stress testing framework arose and the programmatic goals of ensuring economic stability during times of extreme economic stress, the Board's stated reasons for not disclosing the scenarios and models—including gaming considerations—are entirely reasonable.[28]

### B. The Board Adequately Addressed Comments Received Regarding the 2020 Rule

Plaintiffs also argue that the 2020 Rule is arbitrary and capricious because the Board did not adequately respond to the commenters who once again argued that the stress testing scenarios and models should be made available for notice and comment and that the new SCB framework would increase the volatility of capital requirements. Plaintiffs' Brief at 40-41. As an initial matter, there was no reason for the Board to readdress these issues when the Board had already addressed these questions months earlier in the 2019 Disclosure and Policy Statements. As no new arguments were significant enough to justify new responses, the final rule acknowledged that "the Board's methodology for conducting the supervisory stress test was not part of the proposal" and incorporated its responses from the 2019 Disclosure and Policy Statements. AR-

---

[28] Plaintiffs suggest that the Board did not consider reasonable alternatives to not making the models and scenarios subject to notice and comment, such as one commenter's suggestion that the Board could "easily identify and address any [manipulative actions] through its routine monitoring and supervisory activities." Plaintiffs' Brief at 39 (citation and internal quotations omitted). This alternative is vague, and it is not clear from the description how the Board would proactively investigate and identify every novel change firms might make to their balance sheets to try to obtain more favorable results on the stress test. *See Am. Great Lakes Ports Ass'n v. Zukunft*, 296 F. Supp. 3d 27, 53–54 (D.D.C. 2017) (holding that an agency's failure to respond to a commenter suggestion did not violate the APA because the suggestion was presented only obliquely and in one sentence of a forty-page comment), *aff'd*, 962 F.3d 510 (D.C. Cir. 2020).

14, PageID 158 (85 Fed. Reg. at 15,589); *see also Minutemen Health, Inc. v. HHS*, 291 F. Supp. 3d 174, 205 (D. Mass. 2018) (concluding that because comments raised nothing new that the agency had not considered in response to prior comments, it was "not required to re-justify its choice").

Moreover, these comments were not within the scope of the proposed rule. As the Board made clear in the Notice of Proposed Rulemaking for the 2020 Rule, the purpose of the rule was to codify the use of the Board's supervisory stress test in determining the size of the SCB requirement. AR-57, PageID 201 (83 Fed. Reg. 18,160). While the Board did pose a question regarding what other changes the Board should consider making to the stress test, AR-68, PageID 212 (83 Fed. Reg. at 18,171), the main point of the rule was, as Plaintiffs recognize, "codify[ing] the link between the results of the stress tests and the capital requirements imposed on banks: the stress-capital buffer." Plaintiffs' Brief at 39. Thus, unsurprisingly, the Board did not spend significant time addressing questions regarding the transparency of the models and scenarios because this was not the focus of the 2020 Rule. *Cf. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (explaining that an agency action would be arbitrary and capricious if the agency failed to consider an important part of the problem); *Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) (noting that an agency must respond to relevant and significant public comments, but that this requirement is not "particularly demanding").

Notwithstanding the specific scope of the 2020 Rule, the Board discussed the concerns raised by commenters about the increasing volatility caused by the move to the framework tying the SCB requirement to firms' stress test results. The Board found that "[s]ome degree of volatility is inherent to risk-based capital requirements, including those determined by stress

testing, as such requirements are sensitive to changes in a firm's activities, exposures and changes to macroeconomic conditions." AR-5, PageID 149 (85 Fed. Reg. at 15,580). The Board also acknowledged that some volatility was to be expected because the purpose of the stress test is to capture a firm's evolving vulnerabilities and risks. AR-5-6, PageID 149-50 (85 Fed. Reg. at 15,580-81). In addition, the Board noted all of the steps the Board had taken in 2013 and 2019 to improve transparency and to mitigate volatility. *Id.* As such, given the scope and purpose of the 2020 Rule, the Board's responses to commenters regarding issues related to the stress testing methodology and volatility were more than adequate. *See Nat'l Mining Ass'n v. Mine Safety & Health Admin.*, 116 F.3d 520, 549 (D.C. Cir. 1997) (suggesting that agencies are not required to address comments outside the scope of the rulemaking as long as they do not cast doubt on the reasonableness of the agency's position).

### C. Any Relief Relating to the 2019 Disclosure and Policy Statements or the 2020 Rule Should Be Limited to Remand Without Vacatur

To the extent that the Court concludes that any aspect of the Board's response to the comments was inadequate, however, the correct remedy is not to vacate and set aside the 2024 and 2025 stress test models and scenarios or firms' SCB requirements determined using the results of the 2024 stress tests, the 2019 Disclosure and Policy Statements, or the 2020 Rule. Instead, the appropriate course would be to remand without vacatur.[29] "If the record . . . does

---

[29] Plaintiffs also ask this court to "enter a permanent injunction forbidding the Board's enforcement of the stress-capital buffer after October 2026 . . . unless the models and scenarios have been adopted pursuant to notice and comment." Plaintiffs' Brief at 44. The Supreme Court has held that a permanent injunction "is a drastic and extraordinary remedy," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), and it "does not follow from success on the merits as a matter of course," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). Instead, a court weighs four factors, including whether there is "irreparable injury." *Monsanto Co.*, 561 U.S. at 156-57. Establishing irreparable injury is "a high bar." *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 385 (4th Cir. 2017) (citing *Monsanto Co.*, 561 U.S. at

not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course . . . is to remand to the agency for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *see also NACS v. Bd. of Governors of the Fed. Res. Sys.*, 746 F.3d 474, 493 (D.C. Cir. 2014).

The Sixth Circuit has recently held that "whether vacatur is appropriate [in an APA action] depends on the seriousness of the agency error and the disruptive consequences of vacatur." *Sierra Club v. EPA*, 60 F.4th 1008, 1022 (6th Cir. 2023) (quotation omitted). The Sixth Circuit further held that "[n]either . . . factor is dispositive; rather, resolution of the question turns on the court's assessment of the overall equities and practicality of the alternatives." *Id.* (cleaned up). Here, because the Board could remedy any of the purported flaws Plaintiffs raise simply by issuing a supplemental statement, remand without vacatur would avoid a waste of resources from an unnecessary rulemaking. *See Sierra Club*, 60 F.4th at 1022 (the first factor counsels remand without vacatur "'[w]hen an agency may be able readily to cure a defect in its explanation of a decision'" (quoting *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009))); *see also Ohio Env. Council v. U.S. Forest Serv.*, No. 2:21-cv-4380, 2023 WL 6370383, at *3 (S.D. Ohio Aug. 3, 2023) (remanding without vacatur where "the deficiency with the [agency's] analysis . . . appears to be readily curable on remand"). Should the Court identify any procedural concerns, the most appropriate course of

---

165). Here, as articulated above, Plaintiffs cannot demonstrate any action that violates the law, much less an incurable violation, and cannot demonstrate irreparable injury.

action would therefore be to remand for any necessary corrective action without vacating any agency action at issue.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Summary Judgment and grant the Board's Cross-Motion for Summary Judgment.

Dated: April 29, 2025                        Respectfully submitted,

*/s/ Joshua P. Chadwick*
Joshua P. Chadwick
Assistant General Counsel, Trial Attorney
Nicholas Jabbour
Monika Moore
Senior Counsels
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
joshua.p.chadwick@frb.gov
(202) 263-4835

*Attorneys for the Board of Governors of the Federal Reserve System*